Snow *v.* Parsons.

WILLIAM H. SNOW *v.* GIDEON N. PARSONS AND JOHN S. PARSONS.

*Use of running streams. Question as to its reasonableness. Evidence.*

Uses to which the water of running streams may be applied; and considerations determining the extent or manner of such use.

The reasonableness of the use of a stream of water in a particular manner, or for a particular purpose, and the extent to which a proprietor below must submit or accomodate himself to the inconveniences arising therefrom, when it is, in its nature doubtful, is a question of fact. And in determining it, testimony showing the uniform custom of the country in reference to it, is admissible.

ACTION ON THE CASE for the obstruction of the plaintiff's water-wheel by the tan-bark discharged at the defendants' tannery on the stream above, and suffered to float down to the plaintiff's mill. The action was referred, and the referee reported the following facts.

The plaintiff was the owner of a saw-mill in West Dover, upon a branch of Deerfield River, together with a privilege of water to operate the same from 1842 to 1845, when he sold them, and from 1849, when he re-purchased, until the commencement of this suit.

In 1844 a tannery was erected upon the same stream, about a mile and three fourths above the plaintiff's saw mill, and was so situated that the tan vats were directly over the stream, and the spent tan was discharged into the stream, and carried by the water down to and by the plaintiff's saw-mill. On the 4th of Octo-

ber, 1849, the defendants purchased the said tannery, and have ever since continued to own and occupy it, using yearly a large amount of tan-bark, which, after being used, was discharged into the stream and suffered to float down the same. A portion of this tan-bark floated down and lodged in the plaintiff's pond, where it accumulated to considerable extent, and some floated into the flume to the plaintiff's mill, which somewhat incommoded him. Sometimes the tan-bark would accumulate so as to somewhat impede the flow of the water into the flume, but it did not appear that the plaintiff had sustained much inconvenience from that cause, as it was easily removed, and the obstruction did not often occur. The tan-bark accumulated in the plaintiff's pond much more rapidly after the defendants commenced operating the tan works in 1849, and was doubtless owing to the increased quantity of bark used at the tannery; and after October, 1849, portions of it lodged in and upon the plaintiff's saw-mill wheel, whereby the same was impeded and repeatedly stopped, and the plaintiff was thereby subjected to some little delay in operating the mill, and labor in removing the obstruction and getting the wheel in motion. The wheel was of cast iron, and known as the Fergerson reaction wheel, and was so constructed that when tan-bark lodged in it, it was somewhat difficult to remove it, but it might have been altered without impairing its usefulness, and at a small expense, so that the tan-bark would not impede or affect its operations; and prior to 1846 the wheel used was of a different construction, and was not, and would not be obstructed or injuriously affected in any way, by the floating down of the tan-bark.

Upon the hearing before the referee the defendants offered to prove that it had been the universal and uniform custom and practice in all the counties of this state to discharge the spent bark of tanneries into the streams on which they were situated, ever since the country was first settled, and that dam owners situated below on the streams had never, so far as the witnesses knew, disputed the right to do so until now; and that tanneries could not be conducted at any profit without that means of disposing of their spent tan-bark, and that the withholding such use of the streams from tanners, would, in the belief of the witnesses, have excluded that branch of industry from this state; and that the same custom and

the same practice had uniformly prevailed in all the states and counties of New England, so far as the witnesses had had opportunity of knowing.

To this testimony the plaintiff objected. The defendants admitted that prior to 1844, there was no tannery on this stream. The referee, intending to decide according to law, excluded the testimony offered ; and the right of the plaintiff to recover upon the foregoing facts was submitted by the referee to the court ; the damages being assessed at forty dollars, if the plaintiff was entitled to recover.

The county court, September Term, 1854,—UNDERWOOD, J., presiding,—rendered judgment, upon the report, for the plaintiff. Exceptions by the defendants.

*J. D. Bradley* and *Butler & Knowlton* for the defendants.

*Shafter & Davenport* for the plaintiff.

The evidence offered, as to the universal and uniform custom and practice of tanneries, was rightly excluded by the referee. So also as to the " acquiescence of mill owners below."

If such custom exists it must be either a *general* or *particular* custom. It is not a general custom, for if it were, it would be a part of the law of the land, of which the courts would take notice, and would not require proof. It is not a good " particular custom," for 1st, it is in derogation of common right. 2d. It lacks the requisites of a good custom. It is not " ancient," for it appears, on the face of the offer, that there was a time, within legal memory, when it did not exist. It has not been " continued." It is not " certain." It is *unreasonable* ; it has not been " acquiesced " in ; 3d, the " acquiescence" spoken of in the offer, amounts to nothing as to us, for we have not acquiesced ; had we done so for 15 years the case would wear a different aspect.

The opinion of the court was delivered, at the circuit session in October, by

REDFIELD, CH. J. The important and, as I think, the only question in this case, is whether it is proper for extensive tanneries, upon moderate sized streams, to expend their refuse, or spent bark, into the stream. In regard to many uses of the water in streams, it has been so long settled by common consent, or is so

obvious in itself, that it is determinable, as matter of law. Such are the uses for irrigation, for propelling machinery, and for watering cattle, and some others. And in regard to some debris or waste deposits in such streams, there would seem to be no question. The uniform practice, the convenience, and in some instances the indispensable necessity, would seem sufficiently to decide such cases. Among these may be named the infusion of soap dyes, and other materials used in manufacturing, into the streams by which the machinery is propelled. The deposit of saw-dust, to some extent, is nearly indispensable in the running of saw-mills, and most other machinery used in the manufacture of wood, and propelled by water power.

The reasonableness of such use must determine the right, and this must depend upon the extent of detriment to the riparian proprietors below. If it essentially impairs the use below, then it is unreasonable and unlawful, unless it is a thing altogether indispensable to any beneficial use at every point of the stream. An extent of deposit, which might be of no account in some streams, might seriously affect the usefulness of others. So, too, a kind of deposit, which would affect one stream seriously, would be of little importance in another There is no doubt one must be allowed to use a stream in such a manner as to make it useful to himself, even if it do produce slight inconvenience to those below. This is true of everything which we use in common with others. The air is somewhat corrupted by the most ordinary use; large manufacturing establishments affect it still more seriously; and some, by reason of their vicinity to a numerous population, become so offensive and destructive of comfort, and health even, as to be regarded as common nuisances. Within reasonable limits, those who have a common interest in the use of air and running water, must submit to small inconveniences to afford a disproportionate advantage to others.

It seems to us that this question of the reasonableness of the use of a stream, when it is not settled by custom, and is in its nature doubtful, should always be regarded as one of fact, to be determined by the tribunal trying the facts. In the present case it does not seem to have been treated in that light, unless we regard the judgment of the county court in favor of the plaintiff, as determin-

.ing it. And, as much of the testimony rejected might have had an important bearing upon this question, and no notice is taken of this point either in the report or the judgment, we must suppose it was not the purpose of the county court to decide the case upon that ground. Indeed, the report furnished no adequate materials for such a determination. That portion of the defendant's offer which tended to show that tanneries could not be operated to any useful purpose, without thus disposing of their waste bark, was almost a cardinal point, in determining the main question, and, if shown to the extent offered, might justify the court in finally requiring the proprietors below to submit to *some* inconvenience that those above might not be deprived of all benefit of the stream for this kind of manufacture. And the reasonableness of plaintiffs submitting to this inconvenience must depend upon its extent, and the comparative benefit to the defendants, to be judged of by the triers of the facts.

This must be determined upon general principles applicable to the entire business of tanning, and the importance of discharging its waste materials in this mode, and the probable inconvenience of those below. And if, in this view, they regard the use as an unlawful one, then surely the defendants are liable to all damage sustained by the plaintiff, whether he might have used a wheel less liable to such injury, or not.

But if the use is fairly to be regarded as a lawful one, then, probably, the plaintiffs should have conformed their machinery to the altered circumstances of the stream. And if the defendants use of the stream is a lawful and allowable one, it will make no difference that the plaintiff's mill was first erected, if it had not been in operation a sufficient length of time to acquire any prescriptive right to use the water in an extraordinary manner. And as the plaintiff's present wheel was put into his mill after the defendants' tannery was in operation, and his other wheel would not have been unfavorably affected by bark, nothing, by way of prescription, or license, or prior occupancy, can probably be claimed.

And upon the question of the reasonableness of the defendants' use of the stream, it seems to me the uniform custom of the country for generations, would be of some significance in determining its reasonableness. A uniform general custom upon this subject,

ought, upon general principles, to have a controlling force. We think, therefore, the case should go back to be determined, upon the question of fact, of the reasonableness of the use by the defendants; 1st, upon general grounds; 2d, the peculiar facts, if any, affecting the reasonableness of the use in this particular case.

In regard to the usage in the country as to tanneries, for generations, without controversy, if shown as offered to be, and if it is all one way, it would have almost the force of law. For all the cases which we have, where reasonable care and diligence can be determined as questions of law, without going to the jury, have grown up out of the practice of particular classes of persons, which, becoming settled and uniform, and known to all, is declared by the court as a rule of law; which, while it was uncertain, was matter of fact to be determined by the jury. A familiar instance of this is the demanding payment, and giving notice of dishonor of bills and notes, which is now fixed to the day the note or bill becomes due, and giving notice by the mail of the next day. Formerly this was submitted to a jury of merchants, who determined the reasonableness of demand and notice upon the particular facts in the case, with reference to the more common usage of merchants.

So, too, in this particular business, if the court were tanners, we might be able to say that bark must, of necessity, be spent in the stream in order to carry on the work at all, or that, in fact, the bark did not essentially injure the proprietors below, or we might know the contrary of both propositions. But not being such, it seems to us as much matter of fact as any other question of reasonable care and diligence.

It is settled law, that every riparian proprietor may use the water for purposes of manufacture, but so use it as not unnecessarily to abridge the use to others; *i. e.*, every such proprietor may use it with care and prudence. What care and prudence is, in such case, must depend upon the facts of each case, the conclusion to be drawn by the triers of the fact. And to assist them in making this conclusion, if they are not themselves experts in the business, they are entitled to have the experience and wisdom of such as are experts, to enable them to judge of the reasonableness of the particular use.

The measure of reasonable care and prudence in such cases, is

that which prudent and careful men exercise in the management of their own business. And how are we to know this without proof, in those departments of business with which we are not familiar? Proof that all prudent and careful men, in the management of this business, pursued a given course, and that others acquiesced in that course, without objection, would seem to be of the very essence of the inquiry before the jury, in such cases.

Judgment reversed, and case remanded.