HON. JONATHAN ROSS,  
HON. H. HENRY POWERS, } ASSISTANT JUDGES.  
HON. RUSSELL S. TAFT,

---

\* CANFIELD AND OTHERS *v.* ANDREW AND OTHERS.

### [IN CHANCERY.]

*Mill Owners. Riparian Rights. Depositing Sawdust in a Stream. Injunction to Restrain.*

Two mill-owners occupying on the same stream, one below the other, a short distance apart, the questions being as to the right of the upper owner to divert the stream; to store or pond the water; to discharge his sawdust and waste into it; and the power of the Court of Chancery to restrain by injunction. *Held,*

1. That he could divert it on his own land by an artificial channel, as the water was conducted back into its natural course with reasonable care and prudence, before reaching the premises of the orator, and he having received no appreciable injury.

---

\* Argued at the February Term, 1881, decided at the February Term, 1882.

1

Canfield *v.* Andrew.

2. That the maxim, *sic utere tuo ut alienum non laedas,* applies; and that, while the upper owner can use the water in a proper and reasonable manner, yet he must respect and regard the rights of riparian proprietors below him; and is limited in discharging into the stream his sawdust and refuse to what is *absolutely and indispensably necessary for the beneficial use of the water;* and that it is not a question of convenience or economy.
3. Ordered that an account be taken to determine the damage to the lower mill-owner in filling up his dam with sawdust, &c.; that a decree be rendered for this, deducting the proportion occasioned by depositing in the stream the refuse that was absolutely and indispensably necessary for the beneficial use of the water; and an injunction be granted perpetually enjoining the defendants to the use as stated above.
4. That there was no legal injury in storing, or ponding the water, as it was detained only as long as was reasonably necessary.
5. The lands of the orators below their mill were injured by the deposition of refuse; but this was partly from the defendants' mill, partly from the orators' mill, and partly from other sources; but the whole was so inconsiderable that the court refused to apportion the damages.
6. The court has jurisdiction. As this question was not made by plea, answer or motion, it might properly have been treated as waived.

THIS cause was heard at the December Term, 1880, VEAZEY, Chancellor, on bill, answer, replication and proofs. The bill was *pro forma* dismissed. The facts sufficiently appear in the opinion of the court, except the following. The bill states :

"That in 1857, one Property McDonald built, with orators' consent, a saw-mill on said land and stream ; that in 1863 orators owned and took possession of said mill, and have ever since owned the same, and the dam and privilege connected therewith, and have ever since continuously and are now running and using the same, and for the motive power have and do use said stream and those who used the mill before them did the same. That for this purpose, at the time the mill was built, said McDonald in 1857, erected a mill-dam on said lands across said stream about eight rods above the mill ; that same, with some alterations and repairs, is still standing and used by orators ; that said dam with the banks of said stream which are part of said land, form a reservoir or mill pond covering about a quarter of an acre ; that said dam is about fourteen feet high, and when full of water is about

---

* That an injunction will be granted restraining one from allowing blood, &c., to run from his slaughter-house into a stream, see Alb. L. J., April 15, 1882, p. 294, citing 6 Gray, 473; 8 Wend. 315; Wood on Nuisances, s. 724; 8 Eng. L. & Eq., 217; L. R. 1 Ch. App. 349, 142; 5 C. E. Green, 419; L. R. 3 Eq. Cas. 279.—REP.

eight feet deep in deepest part, and said pond holds a large quantity of water; that orators use and always have used for driving the machinery in the mill a large overshot wheel, and the water is brought from the pond upon the same through a wooden tube, which takes it from the pond so near the bottom of the same that nearly all the water in the pond can be carried through said tube on to said wheel, so that when the water is low in the stream, as it frequently is, that there is not enough running to drive the wheel and machinery all of the time, orators can and frequently do run the mill to advantage by shutting the gates and letting the pond fill up, and then drawing it down, and so using the water by ' ponds full.' " . . . . " That the water of said northerly branch does not enter and flow into and through said orators' lands, by reason of being so turned into said ditch in the same channel, course, direction or place in which it has been accustomed previous to its being so turned, and in which orators have a right to have it flow and enter their land. That frequently in low water there has not been and is not sufficient water running in said westerly branch, with what comes into it through said ditch, to run said mills and machinery; that said Caleb, Ernest, and Mattison at such times often have, since said mill was built, shut the gates of their said dam-and let their pond fill up, and thereby stopped all the water from running to orators' mill-pond, and orators have been compelled to stop their machinery for want of water until they chose to open their gates and let the water run again; that frequently in low water said Andrews and those running their mill, will open their gates and let the water down to orators' mill in a large volume, when orators' pond is full of water, and at such times much of it runs over their dam and is of no benefit to them, as it would be if it run into their pond in its natural way and volume."

The answer states :

" Denies that orators have always used a large overshot wheel for driving their machinery; but avers that prior to eight years ago said mill and machinery were run by a small flutter or float wheel, and that the overshot wheel now used by the orators was placed there by them within eight years prior to the commence-

Canfield v. Andrew.

ment of this suit. Admits that water is taken from said pond to said wheel in a wooden tube; but denies that said tube is so inserted or placed in said dam as to draw the water from near the bottom of the pond; but avers that the same is inserted or placed at or near the top of the dam, and that but very little water can be drawn from the pond as the tube or trunk now is and has been since the overshot wheel was put in. Admits that during all the time the mill was run with a flutter or float wheel, the water was taken from the pond to the mill in a trunk placed at the opposite end of the dam from where the water is now taken, and was placed near the bottom of said dam so as to draw the water down to the bottom of said dam, and did so draw it; and avers that during all the time the water was so drawn, until the orators put in their overshot wheel and changed said trunk, no deposit of earth, gravel, sawdust, or refuse from defendants' mill ever accumulated in orators' pond, but on the contrary, the earth, gravel, sawdust and refuse from defendants' mill, which was washed down from above on said stream into said pond was immediately discharged through said trunk into the stream below. Admits that said streams flow in the direction set forth in the bill; but denies that they are about equal in volume of water, and avers that the west branch is more than twice as large as the north branch. Admits that said streams flow through lands of these defendants and west and north of and adjoining lands of orators; and that in 1871 defendants built a saw-mill on the west branch, and afterwards removed a shop standing about four rods above their saw-mill down to their mill and connected the same therewith, and put in machinery and used the same for making clothes pins ever since, and have used a large overshot wheel and used the water of said stream as they lawfully might do. Avers that said shop so situate on said stream was built more than 18 years ago, and that the same was constantly used for turning works, and lathes and other machinery were driven by the water of said stream, and clothes pins and other wooden wares made therein, and that defendants' grantors were the first persons who appropriated the water of said stream to the above uses, and that the same was upon the lands of said defendants, and such use and

Canfield *v.* Andrew.

occupation has been continued ever since. Admits that a dam was built across said stream above the mill and shop of defendants, by one William Holden, about 1866, for a water privilege to make clothes pins, and used by him for two or three years thereafter ; but denies that defendants, after they became the owners thereof, ever enlarged or made higher said dam, or made the mill-pond of larger capacity, or altered or changed the same in any way, except that in a few instances, when water was low, they have put flush boards on top of the dam at night to raise the water in the pond for use next day, which was as much for the benefit of orators as of defendants, their mill being situate below defendants' mill on the same stream. Avers that defendants claim that the dam so built by Holden, was built to take the place, and serve the same purpose, of an old dam which had stood a short distance below on said stream, and a short time previously had been washed away in a freshet, which old dam had been used for a long time, and until swept away, to make a water power to run the machinery in said shop, (so removed by defendants,) in making clothes pins." . . . " Avers that persons living in the vicinity of defendants, and owners of clothes-pin shops and factories and saw-mills have from time immemorial constantly been in the habit and practice of allowing their sawdust, shavings and refuse, or such portion thereof as were worthless, to fall into the stream and be removed by its current, and such is now the prevailing and universal custom in this town and county, which was fully known to orators, and that they themselves have always been in the habit of discharging their sawdust, shavings and refuse made in their works, or the greater portion thereof, into said stream, and defendants and their grantors have so used their mill and shop for more than fifteen years before the commencement of this suit."

*J. K. Batchelder* and *Burton & Munson,* for the orators.

It is a principle of law now well established, that a riparian owner has a right to have the stream of water which passes over his land flow unobstructed in its natural channel without being accelerated or retarded, but with its natural volume and velocity as it

has been accustomed to flow. This right is incident to the property of his land, and he cannot be deprived of it by grant, actual or presumptive. *Aqua currit et debet currere ut currere solebat* is the language of the law. The doctrine that priority of occupation, unless enjoyed for a sufficient length of time to create the presumption of a grant, is no longer sustained by authority, and has never been sanctioned by the courts of this State.

The riparian proprietor through whose land a stream flows is not the owner of the water; all the right he has in it or to it (unless it be to so much of it as he may require for culinary or domestic purposes), is the right common to all the riparian proprietors upon the stream from its source to its mouth. He has no property in the water itself but a simple usufruct while it passes along.

Each may use it as it flows through his land, but not in such a manner as to deprive or injure the proprietors above or below in the equal enjoyment thereof. *Sic utere tuo ut alienum non laedas* —is a maxim of the law peculiarly applicable to the rights and obligations of riparian owners upon a stream.

The flow of water and its volume, as it passes from one boundary to the other, determines to a great extent the value of the privilege. Destroy either the volume or the flow, and the power is gone; both are essential; lessen either, and the value of the property is injured.

In times of drouth the ponding of the water, when thus used, is no material injury. It is discharged in quantities not beyond the usual flow of the stream, and the owner below can use it to advantage and without loss, for it comes to him in such quantities as are required to propel his machinery.

If, on the other hand, the proprietor above was allowed to use the water to propel machinery requiring a larger volume than the ordinary flow, great detriment would be sustained by those below. Further, the water would sometimes be kept back and held, when if allowed to run as it is accustomed to run, he could operate his machinery to advantage, and at other times it would be let down upon him in such quantities as to waste the power which he otherwise would have. Angell on Water Courses, 101, 102, 104,

Canfield *v.* Andrew.

107, 108, 200, 201, 203, 206, 207, 113; *Johns* v. *Stevens*, 3 Vt. 314; *Davis* v. *Fuller*, 12 Vt. 190; 3 Kent, 439; *Brown* v. *Best*, 1 Wilson, 174; *Bellinger* v. *R. R.*, 23 N. Y. 47; *Clinton* v. *Myers*, 46 N. Y. 517; Angell on Water Courses, 547; *Brown* v. *Bowen*, 30 N. Y. 537; *Sacredor* v. *Buss*, 10 Johns. 241; *Thurber* v. *Marsh*, 2 Gray, 394; 10 Wend. 260; Wood on Nuisances, 320, 369, 370, 458, 467, 468; *Gould* v. *Boston Dock Co.*, 13 Gray, 452; *Miller* v. *Lapham*, 44 Vt. 435.

If the injury to the proprietor below is so great as to essentially lessen the usefulness of his mill, the mill-owner above must remove his waste, though it can be done only at great cost.

If the owner above erect works upon the stream greatly disproportionate to the capacity of the stream, and then runs his mill to its capacity, either by ponds full or in times of high water, he cannot deposit his waste in the stream while so running, if by so doing he damages the privilege below. Angell on Water Courses, 238, 240; *Johns* v. *Stevens*, 3 Vt. 314; *Snow* v. *Parsons*, 28 Vt. 459; *Housse* v. *Hammond*, 39 Barb. 89; *Swindon Water Works* v. *Wilts*, 14 Eng. Rep. 91; *Prentice* v. *Gergen*, 74 N. Y. 352 or 341; *Washburn* v. *Gilman*, 18 Am. Rep. 246; *Post* v. *Lewis*, 5 Am. Rep. 526; 18 Am. Rep. 102; *Monsell* v. *Hammond*, 39 Barb. 89; *Howell* v. *McCoy*, 3 Rawle, 256; *Hoskins* v. *Hoskins*, 9 Gray, 390; *O'Reily* v. *McChesney*, 3 Lansing, 278; *Thomas* v. *Brackney*, 17 Barb. 654; Wood on Nuisances, 704, 705, 714, 715,

The defendants have diverted the water of the easterly stream into the westerly one. The orators have a right to have the water of the easterly stream flow upon their land in its natural channel. It is not a question of reasonable use.

Whether it is beneficial to the defendants or injurious to the orators has nothing to do with it. It is a question of strict right. Angell on Water Courses, 107, 111, 229; *Chatfield* v. *Wilson*, 27 Vt. 670; 10 Johns. 240.

*T. Sibley*, for the defendants.

Has the Court of Chancery equity jurisdiction over the subject-matter of this suit?

The diversion of the small stream of water was in 1871—was a past diversion; this is not sufficient to give the Court of Chancery jurisdiction; and is no ground for equitable interference. *Marble & Slate Co.* v. *Adams et al.*, 46 Vt. 496.

The ponding of the water as set forth in the bill, answer and testimony, in this cause, furnishes no ground for equitable interference. The defendants had the right to erect their dam and thereby create a pond, and to so use the water, and obtain the benefit of the fall of the water in the stream on their own land, and to shut their gate in low water, and allow the water to raise in their pond. These were rights which appertain to all water privileges and belong to all riparian proprietors; and the right cannot be abridged or controlled by courts of equity. The abuse of the right would be the proper subject of a suit at law, where the question to be decided is whether the defendant in exercise of his right has made a reasonable use of the water.

There is no evidence in this case that the defendants detained the water longer than was necessary for their proper enjoyment and use of the same, in running their mill and shop. The orators have no right of action in law, or grounds of complaint in equity, for so detaining the water. The evidence all shows that the pond of defendants is small, covering only about one eighth of an acre, and the water was at no time detained to exceed one or one and a half hours, and only sufficient time to enable the defendants to use the same. Angell on Water Courses, sec. 119; *Davis* v. *Winslow*, 51 Me. 290; *Pitt* v. *Lancaster Mills*, 13 Met. 156; *Bruce* v. *Yale*, 10 Allen, 444.

2. The defendants claim and insist that they have the right to discharge their sawdust into the stream, while running their sawmill and clothes-pin shop; and have the right to use the stream in removing waste; and the rule of law upon that subject has been fully settled in this State. See *Snow* v. *Parsons*, 28 Vt. 459; *Jacobs* v. *Allard*, 42 Vt. 303.

The common-law maxim, " *Aqua currit et debet currere*," &c., is not the rule of law adopted by our courts in this State; but on the other hand, all riparian proprietors are entitled to use the water of streams flowing through their lands for manufacturing

purposes, and so far as other riparian proprietors are concerned, are not responsible therefor, although damage and inconvenience may arise therefrom, provided the use of the water is reasonable or necessary in carrying on their works. The defendants have the right to put their sawdust into the stream in running their mill, for such has been the custom iu this State for so long a time that it is now the law of the State. They have also the right to use the water in a reasonable manner to carry away their waste, and are not obliged to draw the same away with teams, as was held in *Jacobs* v. *Allard, supra*. The evidence in this case plainly shows that the stream upon which the orators' and defendants' mills are situated is constantly changing in volume of water, depending upon surface water, the spring and fall freshets, and that neither has water to run his works more than eight months in the year. The defendants claim that at no time have they unreasonably used the water to remove their waste. But if it were otherwise, has the Court of Chancery any right or power to intervene to say what is a reasonable user of this right, and by a perpetual injunction say how much waste the defendants may so remove, at what stage of the water in the stream, and when the defendants shall be restrained from so doing, and to what extent ? An injunction should be certain and definite in its commands; so that the party enjoined may certainly know that the act he proposes to do is or is not a breach of the injunction. If this cannot be made certain, it is a sufficient reason for refusing the injunction. The question of reasonable use depends upon the necessity and benefit to the defendants, the condition of the water in the stream, the extent of injury to the party complaining, and all the facts connected therewith at the time when such right is claimed to have been transcended. These facts and circumstances are constantly changing. What is reasonable use at one time may be unreasonable use at another. The subject-matter, reasonable use, is too uncertain, indefinite and changeable to afford proper or just grounds for granting a perpetual injunction, fixing the rights of the parties and deciding what shall be reasonable use of the water at defendants' mill and shop at all times hereafter.

The answer alleges that the diversion of the water of the east-

erly stream, on the defendants' land, was so made under the license and permission of the orators, and defendants' evidence establishes the same.

The defendants had the right to use the water in the stream flowing through their land, and the use being lawful and beneficial, it must be deemed reasonable if in such use no substantial or actual injury or damage was done to the orators. *Elliot* v. *Fitchburg R. R. Co.*, 10 Cushing, 191.

3. The testimony in this cause proves that it is the universal custom of clothes-pin shops in Bennington County and vicinity, to use the water of the streams upon which they are situated, to remove to a large extent the waste made at their shops, and that orators are constantly doing the same.

The testimony further shows that the defendants and their grantor had used the water of this stream to remove their saw-dust, turning shavings and clothes-pin waste for more than fifteen years prior to the commencement of this suit, and had acquired thereby the right to so use the water in the stream to the extent of the user.

The damage complained of at orators' mill and shop, is small indeed, the cleaning out of the mill-pond twice, and an estimated diminution of water contained in the pond, with slight inconvenience about the wheel and gate. This to a very large extent is caused by the acts of the orators themselves, in raising their trunk in their dam some three or four feet. Previous to that time, as the evidence shows, no sawdust to any inconvenient amount was deposited in said pond, although the defendants and their grantor had for many years before that run their sawdust and clothes-pin waste down the stream. See *Jacobs* v. *Allard*, before cited.

The opinion of the court was delivered by

ROYCE, Ch. J. The bill in this case alleged that the orators then were, and for a long time previous had been, the owners and possessors of a mill and the necessary machinery for operating the same, situate on a small stream flowing into the Battenkill river, in the town of Arlington; that they were the owners of the land through which said stream runs between said mill and the Batten-

kill river ; that said stream was constituted of two small streams the sources of which were some distance above the lands of the orators, and which united their waters upon the land of the orators, thus making the stream upon which the orators' mill was situate : that the defendants were the owners of a mill erected and used for the purpose of manufacturing lumber and clothes pins, situate on the same stream, some distance above the orators' mill ; that they then were and for a long time before had been, engaged in the manufacture of lumber and clothes pins in said mill, and in such manufacture had made large quantities of sawdust, shavings and refuse, and had discharged and thrown the same into said stream, and they had been carried by the current of the stream into the orators' mill-pond, where they had settled and remained and had nearly filled it up, whereby the orators had been compelled to stop their mill, draw off the water in their pond, and at great expense and trouble remove said sawdust, shavings and refuse ; that some portion of said sawdust, shavings and refuse had been carried past the orators' mill and lodged and deposited on their meadow land between their mill and the Battenkill river ; that the defendants had diverted the water of one of the aforesaid streams which helped to make the stream upon which the orators' mill is situate from its natural channel, in which it had flowed from time immemorial, whereby the orators were deprived of its use ; that the defendants were in the habit of storing up, or ponding the water in said stream and then discharging the same in an unreasonable manner, and so as to deprive the orators of the beneficial use of the same. These are the allegations, substantially, upon which the orators predicate their claim to relief in this court.

The answer admits the title under which the property of the parties is held, as alleged in the bill ; that the use of the two mills has been, to a certain extent, as alleged ; that some portion of the sawdust, shavings and refuse made at the defendants' mill has been discharged, or deposited, in said stream, averring that it was necessary to the operation of their mill and the carrying on of their business that it should be so discharged or deposited ; and that in so doing, they were in the exercise of a legal right : and denying that the orators had been injured thereby in the use and enjoyment

of their mill, or their land injured by the lodging or depositing thereon of any sawdust, shavings or refuse made at the defendants' mill. It admits the diversion of the stream and justifies the same ; admits the storing or ponding of the water to a certain extent, and justifies the same.

Upon the issues of fact thus made a large amount of testimony has been taken—much more than seems to have been necessary under the pleadings. The orators pray that an account may be taken of the damages that they have sustained, and that the defendants be decreed to pay the same, and for an injunction.

No question is made in the answer as to the jurisdiction of the Court of Chancery ; and inasmuch as no objection was made to the jurisdiction of that court by answer, plea or motion, the court might properly treat it as having been waived. But inasmuch as the defendants' solicitor in argument insists that the orators have not made out a case that entitles them to any equitable relief, we have considered the jurisdictional question.

The relief that is granted by a court of equity, is either remedial or preventive ; it either grants positive and affirmative relief, or restrains the doing of acts that are against equity and good conscience. In giving remedial relief it usually proceeds by decree ; and administers preventive relief by injunction. The orators in this case pray for preventive, as well as affirmative relief. The allegations in the bill give the Court of Chancery, *prima facie*, jurisdiction over the subject-matter and the parties. When the act complained of is of such a character that courts of law cannot give an adequate compensation for the injury resulting therefrom, or, if continued, would ripen into a right, or lead to a multiplicity of suits, a court of equity may, by injunction, restrain the continuance of the act. In *Blakemore* v. *Glamorganshire Canal Navigation Co.*, 1 Mylne & Keen, 154, 185, it is said by Lord BROUGHAM, in speaking of this remedy, and in a case quite analogous to this in its facts, that such a restraint should be imposed as may suffice to stop the mischief complained of ; and, when it is to stay injury, to keep things as they are for the present. Past injuries are, in themselves, no ground for an injunction ; the province of the injunction being to prevent future mis-

chief. Numerous cases are referred to in the 10th chapter of Angell on Water Courses, and Bennett's edition of Goddard's Law of Easements, where this remedy has been applied to prevent the obstruction or pollution of water courses.

The court, then, having jurisdiction, it must be determined from the pleadings and proofs whether the allegations in the bill are so far proven as to entitle the orators to equitable relief. And first, as to the diversion of the stream complained of. It is found that the defendants diverted the water of that stream from its natural channel by means of an artificial channel made by them, for the purpose of using the water in propelling the machinery of their mill ; and, after it had been so used by them, it was conducted back into its natural channel at a point a short distance above the premises of the orators ; that in so doing they acted with reasonable care and prudence ; that the natural flow of the water in the stream at its point of connection with the other stream below the defendants' mill was not materially lessened by the use so made of it by them ; and, that the orators have not sustained any appreciable injury by reason of such diversion and use. The orators had no riparian rights in the stream where it was diverted ; because they were not the owners of the land through which it runs ; and while it is true that the owner of land, through which a stream flows, has no right to divert its course to the prejudice of those below him, they have no cause for complaint if they are not in any way injured by such diversion. So the defendants were in the exercise of their legal rights in the diversion of said stream and the use of the water.

The allegation that the defendants stored or ponded the water, and discharged the same in such quantities, and at such times as to do a legal injury to the orators, is not sustained by the proofs. The defendants had the right to the use of the water and to detain it as long as was necessary to the proper enjoyment of that right. In the detention of the water they did not exceed that right ; and when they had so used it, it was discharged in a reasonable and proper manner. See Angell on Water Courses, sec. 119, and cases cited.

The complaint, that the orators' lands below their mill were

injured by the depositing thereon of the waste from the defend-
ants' mlll, is not so sustained as to entitle them to any relief in
this court.    We do not doubt that some of the waste from the de-
fendants' mill was lodged upon the orators' lands.    The waste
from their mill and the orators' mill, and what came from the
Battenkill river, were all commingled together, and caused the
damage complained of.    The aggregate injury occasioned to the
orators by all the waste thus deposited is so inconsiderable in
amount that we do not feel justified in attempting to ascertain
what proportion of it was occasioned by the acts of the defendants.

The remaining and more important question arises under the
allegation of the practice of the defendants in discharging their
waste into the stream and thereby injuring the orators in the use
and enjoyment of their mill.    The fact that the defendants had
been in the habit of either discharging the waste from their mill
directly into the stream or leaving it on the banks in such position
that it found its way into the stream in such quantities that it filled
up the orators' pond to the extent that they were put to consider-
able necessary expense in removing it, and that it seriously inter-
fered with the profitable use of their mill is established by the
proofs.    It is equally as well established that there was no neces-
sity for the defendants to dispose of their waste in that manner.
It was a matter of convenience for them to so dispose of it ; they
could have gotten rid of it in some other way, but that would have
entailed upon them additional expense.

Upon these findings the equitable rights of the parties are to be
determined.    Shall the defendants be permitted to dispose of their
waste as they have hitherto done, notwithstanding the injury it
may occasion to the orators ?  or shall they be enjoined ?

The maxim, *Sic utere tuo ut alienum non laedas,*—which has
always been understood to mean that one must so use his own
property as not to injure that of another—is one of general appli-
cation both at law and in equity.    The practical enforcement of
the principle therein contained has been suspended only in excep-
tional cases, and when, owing to peculiar circumstances, it has
been deemed unjust and inequitable to apply it—as when ques-
tions of public interest, benefit or convenience, were involved, and

it has appeared that the damage to the property owner or owners would be more than compensated by the benefit to them and to the public, arising from a continuance of the act producing the injury ; or, where there has appeared to be a public necessity that could only be met by the continuance of such act.

The cases of *Snow* v. *Parsons*, 28 Vt. 459, and *Jacobs* v. *Allard*, 42 Vt. 303, are relied on as authority for the proposition that this case is to be regarded as coming within the exception to the above maxim. In *Snow* v. *Parsons*, the court, in speaking of the right to the use of water, say that the reasonableness of such use must determine the right, and this must depend upon the extent of detriment to the riparian proprietor below. If it essentially impairs the use below, then it is unreasonable and unlawful, unless it is a thing altogether indispensable to any beneficial use. The court further say that there is no doubt one must be allowed to use a stream in such a manner as to make it useful to himself, even if it do produce *slight inconvenience* to those below ; and that testimony showing the uniform custom of the country was admissible upon the question of the reasonableness of the use made. In *Jacobs* v. *Allard* the facts were different ; but the same question was before the court, and they say that " the true idea of the law involved and governing the subject of this cause is well stated and developed in *Snow* v. *Parsons ;*" and although Judge BARRETT, in what is subsequently said in the opinion, uses language that, taken alone, might be construed as giving an unlimited right to the manufacturer to discharge his waste into the stream upon which his works are situated, we think that language must have been used with reference to the facts as they appeared in the particular case then under consideration, rather than with the intention of promulgating a general rule upon the subject. The qualification stated by the learned judge in the subsequent portion of the opinion confirms us in this belief.

While it is true that a manufacturer has the right to appropriate and use the water of a stream in a proper manner, it is equally true that he must respect and regard the rights of riparian proprietors below him ; and while such owners must submit to such inconvenience and injury as may result from *such* use, they are

not compelled to submit to damages which are not *necessarily* occasioned thereby. Such damages as are incident to, and necessarily result from, a proper use of the water must be borne ; but the manufacturer has no right to do any act that in its consequences is injurious to others because it is a matter of convenience or economy for him to do it. It is as much the duty of a manufacturer to so dispose of his waste as not to injure others, as it is to refrain from injuring others by any other act. No one is allowed to deposit any substance in a running stream that will pollute its waters to the injury of a riparian proprietor below. *Wood* v. *Sutcliffe*, 8 L. & Eq. R. 217 ; Goddard's Law of Easements, (Bennett's edition,) 67 and 253. Neither has any one the right to deposit any other substance in such a stream, beyond what is absolutely necessary to a beneficial use of it, to the injury of mill-owners or the lands through which the stream may run. It would be manifestly unjust to hold that a manufacturer could so conduct his business as to seriously impair the value of the rights and property of other manufacturers on the same stream, below, and injure or perhaps ruin lands of riparian owners without accountability, upon the showing that it was more convenient and economical to him thus to conduct it.

The acts of the defendants in depositing the waste made at their mill in the manner we have found it has been done, were illegal, and a perpetual injunction will be issued, enjoining them, their heirs, executors, administrators and assigns from so disposing of it in the future.

We do not understand in what is now decided, that we are overruling the decisions relied upon by the defendants in 28 and 42 Vt. ; but applying the law, as there laid down, to the facts found in this case.

The *pro forma* decree of the Court of Chancery, dismissing the bill, is reversed and the cause remanded, with a mandate that an injunction be issued perpetually enjoining the defendants, their heirs, executors, administrators and assigns from depositing any sawdust, shavings or refuse in the stream described in the orators' bill, at any point above the orators' mill, except such as may be absolutely and indispensably necessary for the beneficial use of

the water of said stream by the defendants ; and that an account be taken of the damage that the orators have sustained on account of the lodging or depositing of sawdust, shavings and refuse made at the defendants' mill in their mill-pond, and in the operating of their mill and machinery in consequence thereof.   And that upon the ascertainment of the amount of such damages, and after deducting therefrom the proportion thereof that shall be found to have been occasioned by the depositing in said stream of such sawdust, shavings and refuse by the defendants as was absolutely and indispensably necessary for the beneficial use of the water of said stream at that time, a decree be entered for the orators for the amount of the damages that may be so ascertained.   And that the costs in the Court of Chancery and in this court be apportioned and settled by the Court of Chancery.