BETTY KASUBA ET AL. *v.* FRED H. GRAVES.

May Term, 1937.

Present: POWERS, C. J., MOULTON, SHERRBURNE and BUTTLES, JJ., and SHIELDS, Supr. J.

Opinion filed October 5, 1937.

194

*Philip M. M. Phelps* and *Andrew C. Calvi* for the plaintiffs.

*Bert L. Stafford, Fenton, Wing & Morse* and *R. Clarke Smith* for the defendant.

SHIELDS, Supr. J. The plaintiffs by a bill in chancery sought to enjoin the defendant from discharging water from his quarries, by means of pumps, so that it found its way into a brook and onto the lands of plaintiffs, alleging among other things that thereby the defendant had caused an unnatural flow of water across their lands, including their barnyard, meadow and tillage lands; that the water washed away valuable earth onto the lands of others; and that, if permitted to continue, it would cause irreparable injury to them by depositing refuse from the quarries on the premises and depreciating the value of their farm.

In his answer, the defendant denied these allegations, except as to the pumping of water from the quarries, and averred that the natural flow of the water is through the barnyard of plaintiffs, where for many years by necessity the plaintiffs have maintained a stone culvert over the ditch or bed of the stream where the water regularly flows, and that the plaintiffs had permitted this to become clogged with stone, dirt and other débris, so that the natural flow of the water was stopped to a large extent, and that, if these obstructions were removed, the plaintiffs would not have the difficulty with the water of which they complain.

A temporary injunction was issued, and, after full hearing and findings of fact by the chancellor, defendant was permanently enjoined from discharging water from such quarries into the brook running through the lands of the plaintiffs, "except such as may be absolutely and indispensably necessary for the beneficial use by the defendant of such quarries in the operation thereof." From this decree, the plaintiffs appeal.

The following are the principal facts established: The plaintiffs are the owners and operators of certain farm premises in Poultney, in Rutland County, which they occupy as a homestead. In August, 1935, while this farm was so owned and operated, the defendant became the owner, by purchase, of certain property lying easterly of the farm of plaintiffs, consisting in part of two slate quarries, defendant being the sole owner of one quarry and part owner of the other. These quarries are known respectively as the "Big Quarry" or "North Quarry" and the "South

Quarry.'' The premises of the defendant slope to the west, that is, toward the farm of plaintiffs. At the westerly end of the so-called Big Quarry, there is a natural watercourse, a brook, which runs westerly to the road leading from Poultney to Granville, thence in the same general course through the premises of plaintiffs to the land of others. There is a drainage from the east into this brook of something over 100 acres. The barnyard of the plaintiffs is located just westerly of the highway mentioned, and the brook passes through the barnyard. In this barnyard is a stone culvert, constructed by a predecessor of plaintiffs in title, through which the brook runs and thence through meadow and tillage lands of the plaintiffs. At the time the defendant purchased these quarries, they had not been operated for some years and both were full of water. They cannot be operated while in that condition. To operate them, it is necessary to keep the water down to certain levels, and this can only be done by pumping from them. After their purchase, the defendant installed two electrical centrifugal pumps to remove such water. The first of these had a five-inch intake and a three-inch discharge, and the second, installed a little later, had a six-inch intake and a five-inch discharge. After installation, both pumps were operated twenty-four hours a day until stopped by the issuance of the temporary injunction mentioned. The defendant never obtained the consent of plaintiffs to pump the water, nor did he give them any notice of his intention in relation thereto. The water pumped from the Big Quarry seeped into the brook at the northwest corner of the quarry, and that pumped from the South Quarry seeped down to the west through lands of the defendant and came into the brook by way of a ditch at a point near where the brook crosses the road.

As to the effect of such pumping, the chancellor found:

"This pumping by the defendant caused an unnatural flow of water through the brook and over the premises of the plaintiffs,'' and that,

"When pumping was going on the water which came down onto the premises of the plaintiffs interfered with their going from their house to their barn, one building being located on one side of the brook and the other on the opposite side, there being a culvert between the two buildings, and this

would be covered with water. Certain damage to crops was sustained and they had to plow over some of the tillage land, and new water courses were made in the meadow land, but no evidence was introduced in the case tending to show what monetary damage, if any, was sustained by the plaintiffs as the result of this pumping.

"There was evidence in the case to the effect that if the brook or ditch, as it was referred to, and the culvert in the barnyard were kept open in a proper manner that no damage or trouble would result to the plaintiffs from the pumping, and I so find this to be the fact. No evidence, however, was introduced to show what would be the reasonable cost of digging out the ditch or brook and cleaning out the culvert to put them in such shape that the water would flow through them without damage to the plaintiffs.''

The chancellor also made the following findings:

"When the defendant first purchased his premises he employed four men. He increased his force so that at the time of this hearing he was employing fifty, and he planned to employ about seven more.

"As a result of the opening of these quarries by the defendant about thirty men were taken off the relief rolls in the town of Poultney.

"I find that if the defendants were allowed to pump, with proper restrictions, that the damage to the plaintiffs as a result of such pumping, if any, would be slight as compared to the damage that the defendant and the community in general would suffer if he were absolutely restrained from pumping the said quarries.''

Apparently, in view of this latter finding, the chancellor considered the doctrine of comparative equities applicable to the situation, and drew his decree accordingly.

The plaintiffs contend: (1) That the decree does not grant them the relief to which they are entitled under the law; (2) that

the case is not one for the application of the doctrine of comparative equities; and (3) that the plaintiffs are entitled to adequate relief regardless of their failure to show the amount of their monetary damage, in view of the nature of the damages to them found by the chancellor.

▪ ■ This case was tried below, and has been briefed in this Court, upon the theory that the plaintiffs and defendant were respectively lower and upper riparian owners, and that their rights are governed by the law applying to such owners, and we so treat it. *Gentes* v. *St. Peter*, 105 Vt. 103, 104, 163 Atl. 569; *Shields* v. *Vermont Mutual Fire Insurance Co.*, 102 Vt. 224, 255, 147 Atl. 352; *Saliba* v. *N. Y. C. R. R. Co.*, 101 Vt. 427, 440, 144 Atl. 194; *Sharby* v. *Town of Fletcher*, 98 Vt. 273, 278, 127 Atl. 300.

■■ While it has been said, and is true as a general statement, that every owner of land over which a stream flows has the right to the natural flow of the stream, and cannot be deprived of it but by grant, actual or presumptive, *Davis* v. *Fuller*, 12 Vt. 178, 190, 36 A. D. 334; *Chatfield* v. *Wilson*, 31 Vt. 358, this is subject to the qualification that riparian owners have correlative rights and must so use their own rights as not to deprive others of an equal enjoyment of their same rights. *Chatfield* v. *Wilson, supra,* at pages 362, 363, 31 Vt.; *Lawrie et al.* v. *Silsby et al.*, 76 Vt. 240, 252, 56 Atl. 1106, 104 A. S. R. 927. But our decisions have also established that this restriction does not go so far as to deprive an upper riparian owner of the right to a reasonable use of the waters of a stream, even though such use may involve some slight inconvenience or detriment to those situated below. *Snow* v. *Parsons*, 28 Vt. 459, 462, 67 A. D. 723; *Jacobs* v. *Allard*, 42 Vt. 303, 304, 1 A. R. 331; *Canfield* v. *Andrew*, 54 Vt. 1, 15, 16, 41 A. R. 828; *Lawrie et al.* v. *Silsby et al., supra.*

Cases in which the rights of riparian owners have heretofore been considered in this jurisdiction have usually arisen under one of three classes, which, with some illustrative cases, are as follows: First, where the lower riparian owner obstructed or dammed the stream in such a manner as to set the water back upon the upper riparian owner, and thereby interfere with the use by the latter of his land or water power. *Johns* v. *Stevens*, 3 Vt. 308; *Ames* v. *Dorset Marble Co. et al.*, 64 Vt. 10, 23 Atl.

857; *Royce* v. *Carpenter & Taylor*, 80 Vt. 37, 66 Atl. 888; *Doty* v. *Village of Johnson*, 84 Vt. 15, 77 Atl. 866. Second, where the upper riparian owner diverted or dammed the stream for his own use, resulting in some diminution or irregularity of flow to the lower riparian owner. *Norton* v. *Volentine*, 14 Vt. 239, 39 A. D. 220; *Ford* v. *Whitlock*, 27 Vt. 265; *Canfield* v. *Andrew*, 54 Vt. 1, 41 A. R. 828; *Lawrie et al.* v. *Silsby et al.*, 82 Vt. 505, 74 Atl. 94, 30 A. D. 220. Third, where the upper riparian owner, in the use of the stream for manufacturing purposes, discharged into it refuse or waste, resulting in more or less inconvenience and damage thereby to lower riparian owners. *Snow* v. *Parsons*, 28 Vt. 459, 67 A. D. 723; *Jacobs* v. *Allard*, 42 Vt. 303, 1 A. R. 331; *Canfield* v. *Andrew, supra.*

In the instant case, the quarries are not situated directly on the stream, and the waters thereof are not dammed up or diminished, nor actually used as such, in the operation of the quarries, but the natural flow of the brook is increased by the discharge of accumulated and accumulating water in the quarries, by the pumping thereof onto defendant's land, whence by seepage it comes into the waters of the brook flowing through his and the plaintiffs' land, and thereby augments the natural flow thereof to the detriment of the plaintiffs to the extent shown by the findings hereinbefore quoted. The rights of persons so situated have never before been passed on in this jurisdiction. Indeed, so far as we have been able to find, there are few cases in any jurisdiction dealing with the increased flow of water in a stream caused by the upper riparian owner, and none of them is exactly in point, but some of the more pertinent will be referred to later.

██ ██ The failure of the plaintiffs to show the amount of their monetary damage, if any, by the increased and unnatural flow of the waters of the brook caused by the pumping, does not affect their right to injunctive relief, if their case is otherwise made out. The damages detailed by the chancellor must be considered as substantial in character. *Johns* v. *Stevens*, 3 Vt. 308, 315. And equity will not refuse relief where there has been an unwarranted invasion of a person's property, likely to be continuous in character, and such as, continued under a claim of right, might ripen into an easement. *Doty* v. *Village of Johnson*, 84 Vt. 15, 23, 77 Atl. 866; *Murphy* v. *Lincoln*, 63 Vt. 278,

280, 22 Atl. 418; *Canfield* v. *Andrew*, 54 Vt. 1, 12, 41 A. R. 828; *Cloyes et al.* v. *Middlebury Electric Co. et al.,* 80 Vt. 109, 116, 66 Atl. 1039, 11 L. R. A. (N. S.) 693. See, also, *Sisters of St. Joseph Corp.* v. *Atlas Sand, etc., Co.,* 120 Conn. 168, 180 Atl. 303, 306.

 The defendant claims that the cases of *Snow* v. *Parsons, Jacobs* v. *Allard,* and *Canfield* v. *Andrew, supra,* fully justify the pumping of water from the quarries by the defendant to the extent permitted by the chancellor's order. But none of these have to do with an increase of the flow of the water itself, but with the discharge into the stream running in its natural state of refuse or waste matter resulting from manufacturing operations conducted by a mill situated on the stream. The first of these cases relates to the discharge into a stream of spent tan bark from a tannery; the other two deal with the putting of sawdust, shavings and waste into a stream. *Canfield* v. *Andrew* reviews the holdings of the first two of these cases, and shows that the language used therein applies to the facts of the particular case. A careful reading of these three cases establishes that, even as to the deposit of waste products of manufacture in a stream, the rights of an upper riparian owner are not unlimited. ''The reasonableness of such use must determine the right, and this must depend upon the extent of the detriment to the riparian proprietors below.'' *Snow* v. *Parsons, supra.* The upper riparian owner has a right to appropriate the use of a stream in a *proper* manner, but he must respect and regard the rights of riparian owners below, ''and, while such owners must submit to such inconvenience and injury as may result from such use, they are not compelled to submit to damages which are not necessarily occasioned thereby.'' *Canfield* v. *Andrew, supra,* pages 15, 16 of 54 Vt. The Court in that case, at page 16, further said,

> ''It would be manifestly unjust to hold that a manufacturer could so conduct his business as to seriously impair the value of the rights 'and property of other manufacturers on the same stream, below, and injure or perhaps ruin lands of riparian owners without accountability, upon the showing that it was more convenient and economical for him thus to conduct it.''

At most, these cases go no further than to hold that riparian owners, as against each other, are entitled to a reasonable use of the waters of a stream. See, also, *Lawrie* v. *Silsby*, 76 Vt. 240, 252, 56 Atl. 1106, 104 A. S. R. 927.

We think these cases are readily distinguishable from the instant case, where the defendant acquired quarries not in operation and then filled with water, did not discharge into the stream the waste products of his manufacture to be carried away by its natural flow, but proceeded to pump water from the quarries, in order to commence and continue their operation, in such quantities that it increased the natural flow of the brook running through the lands of plaintiffs to such an extent as to overflow portions of it, interfered with plaintiffs going from their house to their barn, carried sand and gravel onto tillage land, necessitated replowing of some tillage land, and cut new water courses in their meadows.

Among the few cases in other jurisdictions relating to increase of the natural flowage of a stream, *Tillotson* v. *Smith,* 32 N. H. 90, 64 A. D. 355, and *Hyatt et al.* v. *Albro et al.,* 121 Mich. 638, 80 N. W. 641, are the only cases found where the facts upon which the decisions are based seem sufficiently near those here to make discussion of them helpful.

In *Tillotson* v. *Smith,* the question of an injunction was not involved, but it was an action on the case for damages occasioned by an increase in the natural flow of a stream. The plaintiff therein owned a tract of land through which a brook ran in a natural channel, on which the defendant had a mill above plaintiff's holdings run by water power.. Near this brook was another stream of about equal size. To aid his water power, the defendant placed a small dam on the last-mentioned brook, cut a channel therefrom to the one on which his mill was situated, and thereby, for a short time, augmented its flow. This caused the water to run higher in the brook through plaintiff's land and to overflow in a few low places. In holding that the defendant must respond to the plaintiff in damages, the Court said, in part:

> "It seems very evident that if a man's land is materially damaged by water thrown upon it by reason of the acts of another, it can make no difference what the source of the water may be; whether it be backwater, or the flowage of the same, or the

water of another stream. The wrong consists in turning any water upon the land which does not naturally flow in that place; and it can make no difference if the water wrongfully turned upon a man's land against his will flows in the channel of an ancient stream, or in a course where no water flowed before, if similar damage results.''

In *Hyatt et al.* v. *Albro et al.*, 121 Mich. 638, 80 N. W. 641, the upper riparian owners wished to reclaim lands overflowed during portions of the year by two lakes which were really enlargements of a river, to accomplish which they proposed to deepen the river. While the court recognized that an upper riparian owner had a right to a proper use of the stream, though it resulted in some inconvenience to a lower proprietor, it was held that such upper owners could not drain the lakes so as to impede or accelerate the natural flow of the river to the lower mill owner's dam.

While the facts in these two cases are not the same as the one now under consideration, we think the principle applied in each is equally applicable here. While the findings are silent as to the size of the brook, it was insufficient to care for the additional load put upon it by the pumping done by defendant. In other words, it was too small for such use. The size and character of the stream and the use to which it is subservient are pertinent for consideration in determining the reasonableness if its use. *Lawrie* v. *Silsby*, 82 Vt. 505, 512, 74 Atl. 94. As said in *Snow* v. *Parsons*, 28 Vt. 459, 462, 67 A. D. 723, the extent of the deposit or the kind of a deposit in a stream which might affect one stream seriously would be of little importance to another.

What is a reasonable and proper use of the waters of a stream by a riparian owner is usually a question of fact for the trier, *Lawrie* v. *Silsby*, 76 Vt. 240, 252, 56 Atl. 1106, 104 A. S. R. 927; *Fraser* v. *Nerney*, 89 Vt. 257, 260, 95 Atl. 501; and though the trier fails to make an express finding on the subject, if it can be inferred from the facts found that the use was reasonable, and such an inference is necessary to support the decree, the Court will assume that the lower court drew this inference. *Fraser* v. *Nerney, supra*. Here, the chancellor has made no finding as to the reasonableness of the use. The

facts do show material damage to the plaintiffs from the unnatural flow of the brook caused by the pumping from defendant's quarries. Under the circumstances of this case, we think the use shown was unreasonable as a matter of law, and that an inference otherwise would not be justifiable.

The order of the chancellor, in effect, permits the defendant to continue such use, for thereunder he may still continue to discharge the water from these quarries into the brook running through the lands of plaintiffs to such an extent "as may be absolutely and indispensably necessary for the beneficial use by the defendant of such quarries in the operation thereof," which is but another way of saying, that, if it is absolutely and indispensably necessary to the operation of such quarries, he may discharge any quantity of water into this brook, regardless of the extent of damage to the lands of plaintiffs. But the necessities of the defendant cannot measure the rights of the plaintiffs. *Lawrie et al.* v. *Silsby et al.*, 82 Vt. 505, 512, 74 Atl. 94; *Wheatley* v. *Chrisman*, 24 Pa. St. 298, 64 A. D. 657. This order of the chancellor is practically identical with that issued in *Canfield* v. *Andrew*, 54 Vt. 1, 41 A. R. 828, but we have already shown that it was the different facts in that case which justified the order made therein. As it seems clear that the pumping of the water from these quarries to the extent permitted by the decree of the chancellor will result in a continuing injury to the plaintiffs, and that they are without adequate remedy at law, such order should be modified, unless the doctrine of comparative equities, invoked by the defendant, is applicable.

The courts have frequently been called upon to consider this doctrine, but their decisions are not uniform as to its application. One line of decisions holds that the interference with water rights amounts to a deprivation of property, and that the owner is entitled to an injunction restraining such interference; other courts have taken the position that it is but equitable to take the comparative injury to the parties into consideration. It would seem to serve no purpose to discuss these cases from other jurisdictions. Many of them will be found gathered in notes, 46 A. L. R. 60 *et seq.*, and 106 A. L. R. 692 *et seq.* It cannot be questioned but that the application of this doctrine has been recognized by this Court as proper under certain circumstances, including at least one instance in which the rights

of riparian owners were affected. *Curtis* v. *Winslow,* 38 Vt. 690, 692; *Ottaquechee Woolen Co.* v. *Newton,* 57 Vt. 451. Indeed, the United States Circuit Court of Appeals for the Second Circuit, in reviewing our decisions in a case originating in this State, says the doctrine has so much recognition here as to be a part of our jurisprudence. *Smith* v. *Staso Milling Co.,* 18 Fed. (2d) 736, 738. But this Court has made plain, by its refusal to apply the doctrine in other cases, that it is not one of general application, and whether it is applicable at all depends upon the circumstances of the particular case. *Town of Bristol* v. *Palmer,* 83 Vt. 54, 74 Atl. 332, 335, 31 L. R. A. (N. S.) 881; *Doty* v. *Village of Johnson,* 84 Vt. 15, 77 Atl. 866, 868; *Royce* v. *Carpenter & Taylor,* 80 Vt. 37, 66 Atl. 888.

*Curtis* v. *Winslow, supra,* involved application by the orator therein for an injunction against the building by defendant of a barn on his premises about ten feet from the orator's house. The Court recognized the jurisdiction of chancery to grant injunctions to restrain parties from the use of their own lands and buildings for trades and purposes in themselves lawful in situations which would destroy or seriously impair the use of neighboring buildings for the purpose for which they were designed, and said that "* * the restraint of a lawful use ought not generally to be decreed, to the great loss and injury of the defendant where the injury to the orator, which is sought to be avoided, is relatively small."

In *Ottaquechee Woolen Co.* v. *Newton, supra,* the orators therein sought an injunction against the defendant to prevent the erection of a dam across the Connecticut River about two miles below the Ottaquechee River, upon which the mill of the orators was situated, upon the ground that the erection of the dam would throw the water back upon the wheel which propelled the machinery in orators' mill. The case really turned upon the holding of the Court that to grant the relief requested would, by indirection, amount to the Court declaring a forfeiture of charter rights belonging to the defendants, under which they had previously maintained a dam, canal and locks for a number of years, until their maintenance became unprofitable, the dam having subsequently been swept away by a flood, the Court stating that a forfeiture could not be declared except in a proceeding for the purpose. While stating that this conclusion was

decisive against the right to issue the injunction, the Court further said that there was, in its judgment, another reason equally conclusive. It then went on to discuss the matter of comparative equities, and after calling attention to the fact that, subsequent to orators having purchased their mill, they had lowered the water wheel therein to increase the power, which would cause more or less back-water on it if the dam were erected, the Court said:

"We are satisfied that the anticipated trouble from back-water can be nearly, if not quite, obviated by the substitution of a different wheel from the one now in use, and that the substitution can be made at small expense compared to the loss the defendants will sustain by being deprived of the right to use their water power. The defendants have been at large expense in the purchase of the franchise, and of lands adjacent to such falls, and in making preparations to build up a manufacturing business, which, if carried out, can hardly fail to be a great public benefit. To prevent them, by injunction, from going on with their enterprise would, in our judgment, be inequitable."

On the other hand, in *Doty* v. *Village of Johnson, supra,* where the defendant sought to raise the level of its dam higher than the right it had acquired in that respect, thereby raising the level of the stream and setting the water back upon the pasture and meadow of the orator in times of high water, the Court held that this amounted to a taking of orator's property without compensation in violation of his constitutional rights, holding that, if it were for private use, the defendant could only acquire the right to flowage by purchase, "since the State cannot authorize the taking of property for private use against the will of the owner." Although the defendant suggested that the damage to the orator would be very slight compared with that of the defendant if required to lower its dam and invoked the doctrine of comparative equities, the Court held that, in the circumstances of that case, it had no application.

In *Royce* v. *Carpenter & Taylor, supra,* the doctrine of comparative equities was held inapplicable, although the defendant

contended that the orator's damage up to the time of bringing the suit had been but $25, that he could be adequately compensated by a pecuniary sum, and that it would be inequitable to issue an injunction.

In *Town of Bristol* v. *Palmer, supra,* the owner of a water power below a highway bridge spanning a river had a right to dam the stream below the bridge only to a height which would not set the water back so as to change the natural flow under the bridge. Without the consent of the selectmen, he built and maintained a dam below the bridge which was four or five feet above the natural level of the water, thereby causing the water to rise higher on the abutments of the bridge than it otherwise would and to injuriously affect them. The master found that the removal of the dam would injure the defendant $3,000; that the damage to the town by loss of the abutment was $225; that the injury to the bridge by the maintenance of the dam would not exceed $25 a year; "and that the damage to the defendant if the dam were to be removed would be relatively greater and disproportionate to the damage to the town if the dam were maintained." It was held that the owner of the dam, erecting it as he did, acted at his peril. Application of the doctrine of comparative equities was refused.

The chancellor in the present case finds that, if the brook or ditch in the barnyard were "kept open in a proper manner," no damage would result to the plaintiffs from the pumping. If this expression refers to the ordinary flow of water through the brook, then there is no finding that the brook is not sufficiently open therefor; if it refers to the unnatural flow caused by the pumping, which the chancellor finds made the volume of water "greater than that which ordinarily came through the brook in the summer and winter time," we think the plaintiffs were under no obligation to keep it open to care for such unnatural flow. In any event, there is no finding as to the cost to the plaintiffs of keeping it "open in a proper manner," hence an essential element for the application of the doctrine of comparative equities so far as that is concerned is lacking. We think the circumstances of this case bring it more nearly into line with those in which application of the doctrine has been refused than with those in which it was applied. We hold that it is not applicable in this case.

Our holdings herein do not mean, however, that the defendant is necessarily without right to pump any water from his quarries so that it comes into the brook. As a riparian owner he has a right to a reasonable use of the stream. To the extent that pumping from his quarries is absolutely and indispensably necessary for their beneficial use, and can be done without substantial injury to the plaintiffs, he is within his rights. But we hold that, unless he acquires the right from the plaintiffs, he has no right to discharge the water from his quarries in such manner and in such quantities as to increase the natural flow of the stream to the extent that it overflows onto lands of plaintiffs, cuts new channels therein, or damages their crops, and the order previously issued should be changed accordingly.

Our disposition of the case makes it unnecessary to consider questions raised by plaintiffs as to the admissibility of certain evidence received under their objections.

*Decree reversed, and cause remanded, with costs to the plaintiffs. Let a new decree be entered in accordance with the views herein expressed.*