OTTAQUECHEE WOOLEN COMPANY *v.* MOSES NEW-
TON, JOHN C. NEWTON, AND DANIEL
H. NEWTON.

[In Chancery.]

*Injunction. Corporation. Charter, Forfeiture of. Water Rights. Mill Dam. Prescription. Abandonment.*

1. A court of equity will not grant an injunction where it would be by indirection decreeing a forfeiture of a charter ; or, it being discretionary, when it would be inequitable; thus, the defendants were the owners of the stock and franchise of a corporation organized under a charter granted by the legislature, and by which the original corporators were authorized to, and had erected and maintained a dam for locking on certain falls in the Connecticut river for about fifty years in the place where it was proposed to build the new dam; and the court refused an injunction restraining an erection of the dam; and this, as it would indirectly work a forfeiture of the charter, in which there was no provision for its termination. Water had been used for many years from the old dam to propel the machinery of a saw-mill.

2. And the injunction was refused although the old dam had been carried away by a flood some twenty-five years ago, and nothing had been done under the charter since; and although the new dam was to be utilized for manufacturing purposes, instead of maintaining the locks, there being no necessity for them; and although the dam would cause the water to set back a little on the water wheel that propelled the orator's machinery.

3. While a franchise may be adjudged forfeited upon proof of long continued and intentional *non-user*, it can be only in a court of law and in a proceeding to test the right.

BILL IN CHANCERY. Heard on bill, answer, traverse, and testimony, December Term, 1883, ROWELL, Chancellor. Bill dismissed.

The bill was dated January 24, 1882. It was alleged, that the complainant, the Ottaquechee Woolen Com-

pany, was a corporation, organized October 19, 1874, and existing at Hartland, for the purpose of carrying on the business of manufacturing woolen goods at said Hartland in this State; that, at or about said date, for said purpose, the complainant purchased certain real estate, water power, water rights, and machinery, situated in the village of North Hartland, near the mouth of the Quechee river, at a point, about seventy rods from its junction with the Connecticut river; that immediately after its purchase the complainant commenced said business and has continued it to the present time; that at said time said river was divided at the head of the falls, or water power, into two branches by an island ledge at the head or crest of the high waterfall, about one half of the water running over the falls at the northerly side of the ledge, and the other half over south of the same; that the original purchase included the northerly channel and falls; that said channels were both crossed by a dam; that in the fall of 1875, the dam was changed by the erection of a new dam about 100 feet nearer to the crest of said northerly falls, to bring the water of the mill-pond forward and more directly over the wheel; that in July, 1877, to obtain greater power, the complainant lowered its water wheel two feet, thereby securing a head of water twenty-six feet; and that said wheel had been run in this position ever since. It was further alleged, that the waters of the Connecticut river were then, with reference to said falls, the same as they had been for, to wit; about twenty years, during which period both streams had continued to flow in their respective channels, without obstructions below said dam, and for many miles down the Connecticut river; that the Quechee falls are about thirty feet in height in a distance as said river runs of about sixty feet, and that the water or cove at the foot of the falls is on or nearly on a level with the surface of the Connecticut river, and is mainly formed by the flowage or back-water of that river; that said water wheel in the usual run of water stands at a height of from thirty to thirty-six inches above the level of said cove and Connecticut river, and that the step of said wheel at the ordinary run of water is about on a level with the cove; "that at all times of high water in the Connecticut river, the wheel, as the same now stands, is entirely submerged by the back-water of the Connecticut river, and by reason thereof the speed and power of the wheel is greatly

impeded, and the operation and business of the factory is greatly hindered.

"It was further alleged, that on the 26th day of October, 1875, the said corporation, for the purpose of obtaining greater power for the operation of its factory, purchased and took a deed and the possession of the south branch and falls of the Quechee river together with the dam, water power, &c.; that in the purchase and equipment of said water powers, mills, &c., it has expended the sum of about $90,000; that the same is worth to said corporation a much larger sum than the amount so expended as aforesaid; that the said company has invested, and uses in the operating of said business there, a large amount of capital aside from the said sum so expended in the purchase of said property as aforesaid, to wit: $100,000; that the business of the company is very profitable.

"It was further alleged, that one Daniel H. Newton, one John C. Newton, and one Moses Newton, of Holyoke, in the State of Massachusetts, are now threatening to build a dam across said Connecticut river at a place called Sumner's Falls, about two miles below the mouth of the Quechee river, and that they are now preparing to build said dam; that they claim and threaten, that the dam which they are preparing to build there is to be located at or near the crest of said Sumner's Falls, and is to be built six feet in height.

"And complainant alleges, that if the said Newtons are allowed to construct such a dam across said river in place and manner as they threaten, it will greatly injure the complainant's said water power, factory, and business, by causing the water to set back and partly or wholly submerge its said water wheel at all times, and thereby continually, permanently, and materially injure and damage the property and business of said company, as the fall of the water between the said cove at said factory and the crest of said Sumner's Falls is very slight.

"And complainant gives said court further to understand and be informed that said Newtons claim to derive their right and authority to erect such dam from and under certain charters granted by the States of Vermont and New Hampshire for the purpose of building locks around said falls and rendering the same and said Connecticut river navigable,—said charter from said State of Vermont being

granted in 1794, and the one granted by said State of New Hampshire being granted in 1796.

"And your complainant is informed and believes that a canal and locks were made around said falls, and that a dam was built across said river for the purposes of said canal and locks, and that for several years thereafter said canal and locks were used for the purposes of navigation only.

"That some forty or fifty years ago said·canal and locks ceased to be used for any purpose whatever.

"Your complainant is further informed and believes that at some time one David Sumner erected a saw-mill at or near said dam, and that he used the same for some few years; and that about twenty-six years ago said dam and saw-mill were swept down said Connecticut river by the floods, and that thereupon said Sumner abandoned said property and removed said mill to another place farther down said river upon and near the mouth of "Lull Brook," so called, within a few rods of said Connecticut river, and ever after continued his said saw-mill business at that point; that after said dam was carried away as aforesaid no measures were taken to rebuild the same by any one, and no claim of right so to do was made by any one so far as your complainant is informed until said Newtons commenced their said threats and preparation as aforesaid.

"That your complainant and its grantors built their said factory and established their said business without any knowledge or belief that any one had or claimed to have the right to build a dam across said Connecticut river at any point where the same would interfere with the complainant's said water power and business; and it insists that no one has such right.

"Complainant claims and insists, further, that said dam which was originally put across said river at said Sumner's Falls, was put there for the purpose of aiding in the use of said canal and locks, and for no other purpose, and that when said canal and locks ceased to be used the right to keep said dam there ceased also.

"That when said dam was washed away and said Sumner abandoned the same as aforesaid, and before the complainant and its grantors had erected said factory, all right, if any previous thereto had existed, to rebuild or erect a dam at said place, ceased; and that the said Newtons derived no

right or authority in any way to build said dam as they propose, and especially to the injury of your complainant."

The answer of the defendants admitted some of the allegations in the bill, but denied many others;—denied that the complainant had a right to lower its water wheel; that the waters of the Connecticut had for twenty years prior to the time of placing said wheel or building said factory flowed in its natural channel, without any obstruction or diversion, for many miles down said Connecticut, as alleged in said bill; that the water in the cove at the foot of the said falls is on a level with the surface of the Connecticut river, as alleged, &c.; that said wheel as it now stands, is submerged, as alleged.

"Admits that the defendants Moses, John C., and Daniel H., did propose to restore and repair the original dam across the said Connecticut river at said Sumner's Falls, and made preparations for that purpose.

" Denies that said dam was to be located at or near the crest of said falls.

" Says that it was to be located at the place where the dam was formerly maintained.

" Denies that the restoration and repair of said dam will injure the complainant or submerge its wheel as alleged in said bill.

" Denies that the fall of water between said cove and the crest of said Sumner's Falls is very slight.

" Says that there is several feet fall of said water between said cove and the crest of said Sumner's Falls.

" Denies that the complainant or its grantors were ignorant that said dam was formerly kept up and maintained across said Connecticut river, at said Sumner's Falls, of the height and condition proposed by these defendants, and that the right to restore and repair said dam has always been claimed by the owners of said Sumner's Falls privilege.

" Says, on information and belief, that the grantors of said property to said complainant, long before conveying said property to said complainant, knew and acknowledged the right to be unimpaired and in force to have said dam and water privilege maintained and occupied as proposed by these defendants.

" Says, on information and belief, that said complainant corporation at the time it was organized and said property

purchased as alleged in said bill, well knew that a dam had formerly been maintained across said Connecticut river at said Sumner's Falls, and that the right to restore, repair and rebuild the same was claimed by the owners thereof.

" Denies that said dam was originally put and maintained across said Connecticut river, at said Sumner's Falls, for the sole purpose of said canal and locks, as alleged in said bill.

"And this defendant, Daniel H. Newton, further answering says, on information and belief, that, prior to the year 1809, one Perez Gallup, of Hartland, Vt., was the owner of certain real estate and water rights, situated in said Hartland and in Plainfield, N. H., consisting of a saw-mill and mill yard and water privilege on the Connecticut river.

. " That said Perez deceased on or about the——day of——, 1809, and one Elihu Luce was duly appointed administrator of the estate.

" That on the 10th day of October, 1809, said Luce, administrator, as aforesaid, having obtained license from the Probate Court for the district of Hartford, in which district said Perez Gallup resided at the time of his death, sold and conveyed said property for a valuable consideration to David H. Sumner and James B. Sumner, of said Hartland, by a deed.

" That at the time of the execution of said conveyance there was on said premises a certain saw-mill built by said Perez.

" That desiring further rights said David H. Sumner and James B. Sumner, on or about the —— day of——, 1813, purchased and took from Oliver Gallup, of said Hartland, and Leonard Pulsifer, of Plainfield, N. H., a warranty deed conveying the same premises conveyed to them, said David H. and James B., by said Luce, administrator, and also other rights and property.

" That said David H. and James B. Sumner entered into and took possession of said premises under said deeds immediately after the execution thereof, and continued in the occupancy and possession of said land, saw-mill and water privilege, claiming to own the same up to on or about the 26th day of June, 1815, when the said James B. Sumner conveyed to said David H. Sumner all his right, title, interest, and estate in said land, saw-mill and water privilege by deed of that date.

"That from and after the execution of said deed, from said James B. to said David H. Sumner, said David H. Sumner continued in the exclusive occupancy and possession of said land, saw-mill, and water privilege, claiming to be the sole owner of the same until some time in the year 1857, when said mill was swept away, and said dam partially carried away by a flood.

"That at the time of said conveyance to David H. and J. B. Sumner, there was a dam across said Connecticut river at the place where said defendants propose to place their said dam, which furnished power for said saw-mill; and the same was kept up and maintained until it was partially carried away by said flood in 1857."

"That the purchase of said Sumners consisted of a parcel of land lying between the canal and the Connecticut river, on the west side of the river; and on said land was a saw-mill, the same built by Perez Gallup, with a flume connecting said mill with the river, by which the water was drawn from said river to supply the power to said mill, and for the sole use of said mill; and said flume was entirely distinct from and independent of the canal.

"And this defendant, Daniel H. Newton, avers that during all that time the flowage caused by said dam was the same as it will be if said dam is restored and repaired by the defendants as proposed and intended by them to be done.

That David H. Sumner died in 1867; that, in 1872, Benjamin H. Steele, executor of said Sumner's will, with the approval of said Sumner's widow, contracted with one Wm. Allen for the sale of said premises; that said Steele died in 1873; that one Holt, administrator *de bonis non* of said Sumner's estate, with the widow and heir of said estate, conveyed, some nine years later, said premises to the defendant.

"And this defendant, Daniel H. Newton, avers that the defendants bought said premises in good faith, and paid the sums of $3,000 and $250 for the purpose of obtaining said water privilege and lands, supposing that by said conveyance they obtained the right to restore and rebuild said dam to the height and condition that it was kept and maintained by said David H. Sumner, as aforesaid, down to the time of said flood, and a right to build a mill thereon.

Denies that the water privilege was ever abandoned.

Claims by prescription; "and that at the time said defendants bought said premises and paid for them, as aforesaid, they did not know nor did they suppose that the restoring of said dam to the condition aforesaid would, in any way or manner, injure the rights or property of the complainants.

"And this defendant further answering saith:

"That previous to 1794 one Perez Gallup of said Hartland was the owner of about eight acres of land in said Hartland on the bank of said Connecticut river, abutting on and extending a long distance above and below the so-called Sumner's Falls (which falls were then known as the Water Quechee Falls), and also owned a strip of land on the bank of said river, in Plainfield, N. H., directly opposite to said land in said Hartland, and abutting on and extending above and below said falls, and was also the owner of the bed of said river between said two parcels of land.

"That on or about the —— day of ——, 1794, the legislature of the State of Vermont granted to said Perez Gallup a charter, constituting and incorporating him and his associates, their successors and such others as should be admitted members of said company, a body politic and corporate, by the name of 'The Company for Rendering Connecticut River Navigable by Water Quechee Falls,' for the purpose of locking and continuing locks around said falls, and thus rendering said river navigable.

"That on or about the 15th day of March, 1805, said Perez Gallup admitted as associates with himself, in said corporation, Oliver Gallup, Elias Gallup, David Fuller, Abner Mack, Leonard Pulsifer, and Hugh Campbell, and on the same day allotted and conveyed to them, as such associates, seven-eighths of said land and grant, reserving to himself one-eighth thereof,—the stock of said corporation being divided into eighty shares.

"That said corporation, having fully organized, proceeded to build and construct a dam across said river at said falls, and a canal and locks on the Vermont shore of said river, on the land above described, said canal and locks being wholly within the State of Vermont, and said dam partly within the State of Vermont, and proceeded to conduct their business as contemplated by said charter, and so continued to carry on said business, using said canal, locks, and dam therein, as aforesaid, down to and until on or about

the —— day of ——, 1857, when, by a flood, said dam was partly destroyed as aforesaid.

"That, as this defendant is informed and believes, the said business of the said corporation was profitable."

That the defendants are the owners of all the shares of said corporation, the said Holt, said Sumner's widow, and heir conveying them, except one share, in 1881, to them, and that this one share afterwards was purchased by them; that they are possessed of all the rights of the original corporators; that they have the right to restore said dam, &c.; that during all the time from 1808 to 1857, the water set back, on all parties owning above said dam, in the manner as it would be set back if said dam were restored. The defendant John C. Newton testified:

"We found that the restoring of the Sumner dam would give us only about the amount of power we desired to utilize in the manufacture of wood pulp to supply our Holyoke mills."

Vermont charter, in part, granted October 22, 1794:

"AN ACT GRANTING TO PEREZ GALLUP AND HIS ASSOCIATES, AND THEIR HEIRS AND ASSIGNS FOREVER, THE EXCLUSIVE PRIVILEGE OF LOCKING WATER QUECHEE FALLS (SO CALLED) ON CONNECTICUT RIVER.

"WHEREAS, Perez Gallup, of Hartland, in the county of Windsor and State of Vermont, has petitioned that the exclusive privilege of locking and continuing locks on Connecticut river by the Falls in Hartland, may be granted to him and his associates, and their heirs and assigns forever. Therefore,

"It is hereby enacted by the General Assembly of the State of Vermont that Perez Gallup and his associates have the exclusive privilege of locking and continuing locks on Water Quechee Falls, on Connecticut river, through his own land, in Hartland, within the State of Vermont, under the following limitations and restrictions, viz.: That the said Perez Gallup and his associates shall be liable to forfeit to and for the use of this State all right of locking said falls on condition that they shall not within the term of three years after the first day of November next have made

or are making all reasonable exertion in procuring materials, labor, and other necessaries, to forward the erecting of said locks, and shall not have fully erected and completed the same fit for use within the term of ten years from the said first day of November next; that the toll for conveying loaded boats through said locks shall be eighteen-pence per ton, and nine-pence per ton on the tonnage of all empty boats, and eighteen-pence for every thousand feet of boards and timber, and for every six thousand shingles, etc., which sum shall be and remain the rate of said toll forever, excepting the same shall be diminished by the Supreme Court, as is hereafter provided by this act, which freightage shall be carried through in the order of procession in which they shall arrive at said locks." * * * *

" It is hereby further enacted, that if the company shall find it necessary to erect a dam on Connecticut river, and thereby flow or otherwise injure any property lying within this State, the owner or owners of such property so injured shall, upon application to the County Court for the county of Windsor, be entitled to receive from the company aforesaid such compensation as the County Court shall judge just and equitable." * * * *

" It is hereby further enacted, that the said Perez Gallup, his heirs and assigns, shall at all times cart and carry by said falls all loading whatsoever, and boats in the turn and order of succession as they shall arrive at the respective landings at said falls. And in case he or they shall neglect or refuse so to do on any day (Sundays excepted) after the space of twelve hours from the time he shall be thereunto requested, and the respective turn shall come within that time, he or they shall forfeit and pay to the party so requesting and aggrieved the sum of five pounds lawful money for every twelve hours after the said first twelve hours, from sun-rising to sun-setting, he or they shall so refuse or neglect." * * * *

"And the said Perez Gallup and his associates be and they hereby are made a body politic and corporate by the name of the company for rendering Connecticut river navigable by Water Quechee Falls, and they and their successors, and such others as shall be hereafter admitted members of the said company, shall be and continue a body politic and corporate by the same name forever."

New Hampshire charter, in part, granted December 8, 1796 :

"And be it further enacted, that the proprietors aforesaid be and they hereby are invested with the exclusive right of cutting a canal, locking and rendering said falls navigable for boat and rafts, and are like invested with every power and every privilege necessary to carry the same into effect, provided that nothing herein contained shall be construed to authorize said proprietors to raise such obstructions as shall prevent the passage of masts and loose mill logs down the river as heretofore."

*S. E. Pingree, W. C. French,* and *James Barrett,* for the orators.

The legislature has no power to authorize the damming of rivers for mill purposes. *Tyler* v. *Beacher,* 44 Vt. 648.

The exercise of the right of eminent domain by corporations, under their charters is limited to the object and purpose of their grants, and can only be for some public purpose or use. Cooley Con. Lim. s. 531; *R. R. Co.'s Appeal,* 79 Pa. St. 257; *Eldridge* v. *Smith,* 34 Vt. 484; *Allen* v. *Jay,* 60 Me. 124; 37 Wis. 400. The legislature cannot make that a public purpose which is not so in fact. Cooley Con. Lim. s. 618, *n.; Freeland* v. *Hastings,* 10 Allen, 570; *R. R. Co.* v. *McFarland,* 43 N. J. 605–20.

The foregoing proposition is predicated upon the assumption that the objects and purposes for which the legislature granted the right to lock the falls long ago ceased to exist.

The object and purpose of the charters to the canal company having ceased. the powers and rights conferred by the charters also ceased. *Stewart's Appeal,* 56 Pa. St. 413.

As a proposition of law, then, we claim that the right granted in the exercise of eminent domain on the part of the State, as against the riparian owners above, under the facts of this case, was only an easement, conditioned and dependent upon the necessity of a dam for the purpose and service of the locks; and upon the cessation or termination of the objects and purposes which were the desideratum on

the part of the State, the riparian owners above were relieved of the servitude by which they had theretofore been burdened. *People* v. *White*, 11 Barb. 26; 2 Hill. Real Prop. p. 109; *Tyler* v. *Beacher*, *supra*; Cooley Con. Lim. 656.

To *make* and *maintain* a *dam* was not the purpose for which the charter was granted. Only to provide for a *contingency* that, upon experiment, might be found to exist, viz.: the necessity for a dam for the purpose of rendering the locks usable, was the provision as to a dam put into the charter. No charter would have been granted for making a dam, as an absolute and independent franchise.

If it should be assumed that the charter creating the corporation, and giving the exclusive right of locking, is still in force, any interested party may contest the right of the company to make or maintain a dam, without questioning the right of existence. He may do it in his own name, and without the name of the State, or the writ of *scire facias* or *quo warranto*.

Prescriptive right. The use of the water must be adverse. Wash. Ease. 131; High Inj. 799; Godd. Ease. 160; Ang. Wat. 210; *Corning* v. *Troy Iron & Nail Factory*, 40 N. Y. 191; PECK, J., in *Perrin* v. *Garfield*, 37 Vt. 310; *Brace* v. *Gale*, 10 Allen, 441; *Carlisle* v. *Cooper*, 19 N. J. 256; *Pratt* v. *Lamson*, 2 Allen, 275. No easement can be acquired by prescription, if the servient owner has been incapable from any cause of resisting the user. Godd. Ease. 160; *Sapp* v. *R. R. Co.* 51 Md. 115; *Rockdale Canal Co.* v. *Radcliff*, 83 E. C. L. 287; *Canal Co.* v. *Canal Co.* 1 Eng. & Ir. App. 254. An easement cannot be established by user or grant over the property of a corporation held under its charter for public purposes. *Shield* v. *Arnold*, 4 N. J. Ch. 324; 4 H. & N. 8; *R. R. Co.* v. *McFarlan*, 43 N. J. L. 605; Gould Waters, 225, 331; Godd. Ease. 159; Wash. Ease. 120; *Watkins* v. *Peck*, 13 N. H. 360. The use of the water was the possession of the canal company under its charter. Raym. Ld. 329.

Where an easement is used under a grant or a reservation in a deed, but in a manner somewhat different from the terms of the grant or reservation, it will be deemed to have been enjoyed under the grant or reservation and not adversely, and that no prescriptive right would accrue from such user. *Smith* v. *Higbee,* 12 Vt. 113; *Ford* v. *Flint,* 40 Vt. 382; *Atkins* v. *Boardman,* 2 Met. 437–65; Wash. Ease. ss. 4, 38, p. 95; 36 Vt. 503. The rights of the mill owners ceased when the canal company abandoned the dam for use for the public purpose. High Inj. s. 800; 40 N. Y. *supra.* There was an abandonment. During twenty-four or twenty-five years there has been no act on the part of the corporation indicating an intention to rebuild the dam. *Corning* v. *Gould,* 16 Wend. 531; Ang. Wat. (7th ed.) s. 496; Godd. Ease. 462; 3 Kent Com. 448; *Carney* v. *Andrews,* 123 Mass. 155; 6 Met. 433; *Moore* v. *Rawson,* 3 B. & C. 332; *Taylor* v. *Hampton,* 10 E. C. L. 156; 3 McCord, 96; 23 Pick. 216; 10 Pick. 310. The defendants are estopped to rebuild the dam. 2 Smith Lead. Cas. (5th Am. ed.) 642; Ang. Wat. ss. 328, 412; *Picard* v. *Sears.* 6 A. & E. 469; *Brown* v. *Brown,* 39 N. Y. 520; *Town* v. *Needham,* 3 Paige, 545; *Cobb* v. *Smith,* 16 Wis. 692; *Arnold* v. *Corman,* 50 Pa. St. 50, 361; *Farrar* v. *Cooper,* 34 Me. 399; *Woodbury* v. *Short,* 17 Vt. 387; *Ford* v. *Whitlock,* 27 Vt. 265. An injunction is the proper remedy. High Inj. s. 794; 3 Sumner, 90, 189, 200; 4 Mason, 397; Ang. Wat. s. 444; 32 Vt. 423.

*Wm. Batchelder* and *J. J. Wilson,* for the defendants.

Non-user or mis-user may be cause of forfeiture; but until the forfeiture is judicially declared the charter is in full force; and such forfeiture can only be declared in a suit brought by the State creating the corporation so that the corporation may have an opportunity to answer. Nor can any stranger to the compact take advantage of any non-user or mis-user of a franchise for it is a matter entirely between the State and the corporation.

A forfeiture cannot be enforced against a corporation collaterally or incidentally, or in any other mode than by a direct proceeding. Ang. & A. Corp. 777; 2 Kent Com. 312; *Brandon Iron Co.* v. *Gleason*, 24 Vt. 228; *Heard* v. *Talbot*, 7 Gray, 113; *Canal Co.* v. *R. R. Co.* 4 Gill & Johns. 107; *Regents of Univ. of Maryland* v. *Williams*, 9 Gill & Johns. 365; *Bohonon* v. *Bimms*, 31 Miss. 355; *Harrison* v. *R. R. Co.* 9 Mon. (B.) 470; *Webb* v. *Moler*, 8 Ohio, 549; *R. R. Co.* v. *Long Branch Com'rs*, 39 N. J. L. 28. See also *Bank* v. *Bank*, 10 Gill & Johns. 356; *Brookville T. Co.* v. *McCarty*, 8 Ind. 392; 50 Ala. 332; *Boston Glass Man'fg Co.* v. *Locke*, 24 Pick. 49; *Thompson* v. *R. R. Co.* 3 Sand. Ch. 626; *R. R. Co.* v. *Johnson*, 49 Mich. 148; *Dyer* v. *Walker*, 40 Pa. St. 157; 15 N. H. 162; *Bank* v. *Johnson*, 8 Wend. 645; *People* v. *Manhattan Co.* 9 Wend. 351; *Mosley* v. *Barrow*, 52 Tex. 396; 20 Conn. 557; *Johnson* v. *Huntley*, 16 Ohio, 97; *R. R. Co.* v. *Bailey*, 24 Vt. 476; 7 Conn. 29; 66 Me. 398; 15 N. H 166. A corporation is not dissolved by one or two individuals owning all the shares and the franchise. Ang. & A. Corp. s. 773; *Russell* v. *McClellan*, 14 Pick. 63; *Mining Co.* v. *Bank*, 44 Vt. 489; *Man'fg Co.* v. *White*, 42 Ga. 148; *Spencer* v. *Champion*, 9 Conn. 533; *Wilde* v. *Jenkins*, 4 Paige, 481; 40 Pa. St. 157. The Court of Chancery has no jurisdiction to find or enforce a forfeiture. *Enfield Toll Bridge Co.* v. *Conn. River Co.* 7 Conn. 29; *Hamilton* v. *R. R. Co.* 1 Md. Ch. 107; *Bayliss* v. *Orne*, 1 Free. Ch. (Miss.) 161; *Verplank* v. *Ins. Co.* 1 Edw. 84; *Livingston* v. *Thompson*, 4 Johns. Ch. 415; *Vt. Copper Mining* v. *Ormsby*, 47 Vt. 709; Story Eq. Juris. 1319; *Duncklee* v. *Adams*, 20 Vt. 415; 8 Mon. (B.) 142.

Abandonment is a question of intent. Ang. Wat. 496; Wash. Ease. 639, 649; 121 Mass. 3; *Cong. Society* v. *Stark*, 34 Vt. 254; *Patchin* v. *Stroud*, 28 Vt. 394; *Perkins* v. *Blood*, 36 Vt. 273; Godd. Ease. 461; Gould Waters, 348.

The presumption of abandonment cannot be made from the mere fact of non-user. There must be other circumstances in the case to raise that presumption. Wash. Ease.

645; *Ward* v. *Ward*, 7 Exch. 838; *Eddy* v. *St. Mars*, 53 Vt. 462; Godd. Ease. 461; 8 El. & Bl. 461–91; 1 Add. Tor. 176, 197, *n.; Townsend* v. *McDonald*, 2 Kern. 381; *Pillsbury* v. *Moore*, 44 Me. 155; *Owen* v. *Field*, 102 Mass. 90; Gale & Wh. Ease. 380; 3 Kent Com. 449; *Williams* v. *Nelson*, 23 Pick. 147. There must be acts showing an intention to abandon. 19 N. J. Eq. 141; 44 Me. 154; Ang. Wat. 240, 252; Wash. Ease. 639, 644; 3 Kent Com. 448. The acts and sayings of the defendants' grantors are evidence on question of abandonment. *Noble* v. *Sylvester*, 42 Vt. 146; *Perkins* v. *Blood*, 36 Vt. 273; 1 Greenl. Ev. s. 108.

The right to flow the land may be acquired by adverse enjoyment. Ang. Wat. 372; Wash. Ease.; *Perrin* v. *Garfield*, 37 Vt. 304; *Williams* v. *Nelson*, 23 Pick. 141; Gould Waters, 311; Godd. Ease. 465; 36 Vt. 503; 42 Vt. 712; *Borden* v. *Vincent*, 24 Pick. 301.

The right of the canal company to flow land by virtue of its charter and the right of Sumner to flow the same land by prescription might exist together—one man may have a right by grant and another by prescription to flow the same land for different purposes. *Davis* v. *Brigham*, 29 Me.; Wash. Ease. 139.

The opinion of the court was delivered by

ROYCE, Ch. J.   The grounds stated in the bill upon which the orators predicate their claim for relief are, that the defendants are about to erect a dam across the Connecticut river at a place known as Sumner's Falls, about two miles below the mouth of Ottaquechee river, upon which the mill of the orators is situate, and that the dam so to be erected will throw the water back upon the wheel which propels the machinery in their mill, thus impeding its motion and lessening its power.   The prayer is for an injunction against the erection of said dam.

The defendants base their right to build and maintain the dam upon several distinct grounds.   The first which we

shall consider, is the right claimed under the charters granted by the States of Vermont and New Hampshire. The legislature of Vermont, in 1794, granted a charter to Perez Gallup and his associates giving them the exclusive privilege of locking and continuing locks on Water Quechee Falls (now Sumner's Falls) on Connecticut river through his, the said Gallup's, own land, in Hartland, Vermont. The charter specified the tolls to be paid for carrying property through said lock, and provided, if the company should find it necessary, to erect a dam on Connecticut river and thereby flow or *otherwise* injure any property lying within this State, how the amount of such injury should be ascertained and the manner of its payment. In 1796 the legislature of New Hampshire granted a like charter to Joseph Kimball, Perez Gallup, and their associates and successors.

No right of legislative control over said charters was reserved, except the right to fix and regulate the tolls to be charged. A company was organized under said charters; a dam was erected across Connecticut river; a canal and locks were constructed, and for about fifty years a large and lucrative business was done in carrying property through said locks. The manner of doing business was so changed by the building of the Passumpsic Railroad that after its completion there was not enough business on the river to warrant the expense of keeping up said canal and locks. In 1857 the dam, and a large lumber mill that stood between the canal and river, and which drew its water from the dam, and had been in operation ever since said dam was built, were swept away by a flood. No attempt has since been made to rebuild the dam, unless it be what the defendants have done in the purchase of certain rights which will be hereafter considered, and of material, and in causing surveys and plans to be made.

The company organized under said charters kept and maintained a corporate existence as long as there was a

necessity for maintaining the canal and locks, and until all but one of the shares of stock, which represented the entire property of the company, had become vested in David Sumner. The defendants had purchased all of said shares of stock and all the rights and privileges belonging to said corporation, before the commencement of this suit.

No question is made but that the charters, in their inception, were legal, and such as the legislatures had constitutional power to grant; but it is claimed that the franchise is lost; first because the necessity for the maintenance of the canal and locks has ceased to exist; and secondly by non-user.

The grant of a franchise by a State, when accepted and acted upon, is regarded as a contract between the State and the parties and their successors claiming rights under it; and unless provision is made in the act conferring the franchise for its termination, its validity and existence cannot be questioned except in a proceeding in a court of law brought in the name of the State for the purpose of enforcing a forfeiture. *King* v. *Amory & Monk*, 2 Term, 515; *King* v. *Pasmore*, 3 Term, 199; *King* v. *Saverton*, Yelv. 190.

The reason for the rule is apparent when we consider who the parties to the contract are; the State is under no obligation to insist upon a forfeiture, and may waive any right it has to claim one. The State is not a party to this suit, and would not be bound by any judgment that might be rendered involving the question of the existence of the franchise.

A court of equity never decrees a forfeiture; and granting the injunction prayed for would be doing by indirection what it is not competent to do directly. Enjoining the erection and maintenance of a dam is equivalent to decreeing the franchise lost; for the only manner in which it can be rendered valuable is by the erection and maintenance of the proposed dam.

The rights of the parties cannot be influenced by the

question of the further necessity for maintaining the canal and locks. It may be remarked, however, that it does not appear that the parties claiming said franchise have been in any way responsible for the state of things which has obviated such necessity. Their whole duty to the State was performed while they held themselves in readiness to do what the charters required; and if a necessity should again arise for the use of a canal and locks, and the parties claiming the franchise neglect to provide them, a claim that it should be adjudged forfeited could properly be made.

Soo, too, a franchise may be adjudged forfeited upon proof of long continued and intentional non-user; but such evidence can only be available in a court of law and in a proceeding instituted to test the right. Mere non-user of its franchise by a corporation is not a surrender; nor are courts warranted in inferring a surrender from an abandonment in intention only. Angell & Ames on Corp. s. 743; *Slee* v. *Bloom*, 5. Johns. Ch. 366.

The franchise granted by the charters under which the defendants claim not having been lost or adjudged forfeited, they, having succeeded to all the rights of the corporation acquired under them, are entitled to possess and enjoy all the rights and privileges originally granted in as full and perfect a manner as the grantees or any of their successors might have done.

This view is decisive against the right of the orators to the injunction prayed for; but there is, in our judgment, another reason that is equally conclusive; the writ of injunction is a discretionary writ, and it is the duty of courts, in passing upon the question whether they should be granted or denied, to take a broad and comprehensive view of the situation and ascertain if it will be equitable to grant them. As the wheel that propelled the machinery in the orators' mill at the time they purchased was located, it would be troubled but little if at all by back-water with a dam across

the Connecticut river of the height intended and at the point where the defendants propose to erect one. Some time subsequent to their purchase, for the purpose of increasing their power, they lowered said wheel so that, in its present position, at certain stages of the water, there would be more or less back-water upon it with such a dam across the Connecticut. We are satisfied that the anticipated trouble from back-water can be nearly, if not quite obviated by the substitution of a different wheel from the one now in use, and that such substitution can be made at small expense compared to the loss the defendants will sustain by being deprived of the right to utilize their water power. The defendants have been at large expense in the purchase of the franchise, and of lands adjacent to said falls, and in making preparations to build up a manufacturing business which, if carried out, can hardly fail to be a great public benefit. To prevent them, by injunction, from going on with their enterprise would, in our judgment, be inequitable.

We have not thought it necessary to refer particularly to the numerous authorities cited by the learned counsel. We have examined them carefully, and are confident that they sustain the conclusions to which we have arrived.

No question is made by the bill as to the right of the defendants to use the water which they may secure by the maintenance of said dam for the purposes indicated by the evidence, so we are not called upon to consider or define their rights to its use.

The decree of the Court of Chancery dismissing the bill is affirmed and cause remanded.