# LOOMIS WELLS *v.* STEPHEN F. AUSTIN.

*Tax Sale of Land.   Notice.   Estoppel.   Adverse Possession.*
*Rev. Stat. c. 4, s. 2.   Statute.   Special Act.*
*Signature by Mark.*

1. A sale of land to satisfy taxes assessed by the legislature is not invalidated by the fact that the statute was not strictly complied with as to the publication of the notice of the proposed application to the legislature for the assessment of the tax.

2. A special act of the legislature assessing a land tax is not limited by the general law providing that the committee appointed to superintend the expenditure of taxes, should not be allowed their account for labor, unless it had been completed, to the amount of the tax, within two years from the rising of the legislature.

3. In a case involving the validity of a tax sale, it is immaterial whether the rate bill issued to the collector correctly contained the name of the original proprietor.

4. Under the Rev. Stat. c. 4, s. 2, the majority of said committee could act in the premises.

5. One of the committee signed by mark. The proof of the proceedings was made by copies from the public records; *Held*, that it was not necessary to verify the signature.

6. The collector could lawfully adjourn the sale.

7. ESTOPPEL. A party to avail himself of an estoppel by conduct must show affirmatively that he has acted in reliance upon the fact being otherwise than it is claimed to be; thus, the plaintiff is not estopped, although, prior to his becoming the owner of the lot, he advised with and assisted the defendant in a law suit, in an attempt to establish his title to it, it not appearing that the defendant had done anything in reliance upon the plaintiff's acts.

8. ADVERSE POSSESSION. A possession that will work an ouster of the owner, must be open, notorious, hostile and continuous; thus, where there is no color of title, the fragmentary possession of a wild lot, arising from the paying of taxes, and the cutting of a few trees here and there, and at different times, is not sufficient.

9. SURVEY. A certain survey, *q. v.*, held not sufficient to show color of title.

TRESPASS *quare clausum.*   Heard on a referee's report, September Term, 1884, Essex County, Ross, J., presiding. Judgment for the defendant.   The case appears in the opinion.

*Wm. &. H. Heywood*, for the plaintiff.

The legislature had power to assess the tax without any notice.  *Corliss* v. *Corliss*, 8 Vt. 373 ; *Crosby* v. *School Dist.* 35 Vt. 623.  The sale was valid.

*Bates & May*, for the defendant.

The tax sale was not valid.  The notice of intention to apply to the legislature for an assessment of a tax upon the non-resident land owners was not properly published.  Slade's Comp. 1824, p. 682, s. 2.

The law required a new notice in the newspapers after the extension was granted ; but no new notice was in fact given to the land owners.  By the record it appears that work was done upon the roads by land owners in 1840.  Rev. Stat. p. 405.

The notice of sale to delinquents made in 1840 was signed by Mr. Appleton, and a man also made a mark, said to be Mr. Bell.  The rate bill is also signed in the same way.  Mr. Buck's name disappears after the first notice to taxpayers, March 20, 1838.  Acts 1837, p. 76 ; *Townshend* v. *Gray*, 1 D. Ch. 127 ; *Danville* v. *R. R. Co.* 43 Vt. 144 ; *Bank* v. *Mount Tabor*, 52 Vt. 87.

This statute was a private one, and there is no proof that Mr. Buck in any manner participated in these acts of his associates, or consulted with them.  Will this court call this mark of Mr. Bell a signature of any one until the same is in some manner authenticated ?  *Lyons* v. *Holmes*, 32 Am. Rep. 482.

The sale of 50 acres of land to pay a $2 tax was in violation of the rights of land owners and contrary to the law.  Slade's Comp. 662.

The advertisement of the collector was to sell only so much of the lands " as will be requisite to discharge their respective taxes with costs."  The warrant to collector in this case is to same effect.  *Ainsworth* v. *Dana*, 1 Fost. [N. H.] 400 ; *Loomis* v. *Pingree*, 43 Me. 299 ; *Stead's Ex'r* v. *Course*, 4 Cranch, 403 ; *State* v. *Maxwell*, 6 Wall. 268 ; *O'Brien* v. *Coulter*, 2 Black. 421 ; *Doane* v. *Chittenden*, 25 Ga. 103.

The plaintiff is estopped by his conduct.  The defendant

has gained title to the lot by adverse possession. Bing. R. P. 583; *Perry* v. *Weeks*, 19 Rep. 144; *Hodges* v. *Eddy*, 38 Vt. 337.

The opinion of the court was delivered by

POWERS, J.   This is an action of trespass *quare clausum* to recover damages for cutting timber on lot 5, 4th range in Granby.

The plaintiff claims title through sundry mesne conveyances, under a tax sale of the premises in question made in 1840 by Timothy Fairchild, collector of a land tax.   The defendant interposes sundry objections to said tax sale.

I. The legislature, November 1, 1837, assessed a tax of four cents an acre on the lands in Granby, and appointed Silas Buck, Ashley Appleton, and Nathaniel Bell, a committee to superintend its expenditure, and said Timothy Fairchild collector.   In 1840 the legislature passed an act entitled, " An act reviving an act laying a tax on the lands in Granby," as follows :  " An act laying a tax on the lands in Granby, passed November 1, 1837, is hereby revived, and the committee appointed to superintend the expenditure of said tax are allowed the term of one year from the passage of this act to complete the working out of the same."

At the time both said acts were passed we had a statute in force requiring notices by publication in certain papers of proposed application to the legislature for the assessment of land taxes.   In June, 1837, such notice of the tax in question was published, but not in the papers named in the statute.   It is claimed that this omission invalidated the acts in question, and by consequence the tax sale of Fairchild.

But this is not a case where the jurisdiction of a tribunal to take action is dependent upon notice and an opportunity to be heard.   The legislature has plenary and exclusive jurisdiction over the whole subject of taxation, limited only by constitutional restrictions.   It may act on the subject whether the taxpayer has notice or not.   Similar statutes have been in force

since the earliest organization of the State, and many acts have been passed in disregard of them ; but we have never understood that such acts were void for this reason.   In *Smith* v. *Helmer*, 7 Barb. 416, this question arose under a similar statute in New York.   The court said : " That the notice was a direction to the public calculated merely to guard the legislature from surprise and fraud, and to prevent hasty and improvident legislation ; that the rule was made by the legislature for its own convenience, and might be entirely disregarded ; and that a law would be valid although no notice whatever of its application was published."

The rule of strictness applied to the proceedings of tax sales is only invoked upon those proceedings taken after the legislature imposes the tax.

II.   It is urged that as the tax was not levied, collected and expended within two years from the passage of the act of 1837, Fairchild's authority was gone, and the proceedings should begin *de novo ;* and we are referred to Slade's Comp. 1824, p. 668, s. 7, and Rev. Stat. 1839, p. 406, s. 5, and p. 408, s. 13.   Neither of the statutes referred to, nor any others, fixed any limitation within which the acts in question should continue in force ; but both provide that the committee appointed to superintend the expenditure of a land tax shall not be allowed their account for labor unless such labor, to the amount of the tax, be completed within two years from the rising of the legislature appointing the committee.   This comes far short of a limitation upon the continuance of the act imposing the tax.   It was designed to promote diligence in the repair of roads under a penalty of refusal to audit their accounts.

But this difficulty was avoided by the Act of 1840, which revived the Act of 1837, and extended the time allowed to the committee for completing the labor upon the roads.   The Act of 1837, like all statutes providing for special things to be done, continues in force until such things are done.   The authority to Fairchild was to collect the tax then voted.   His authority would continue until the tax was collected.   So far

Wells *v.* Austin.

as he was concerned, and so far as all other matters and things appertaining to the levy, collection and expenditure of the tax, were involved, except the audit of the committee's accounts, the Act of 1837 needed no revival; and the Act of 1840 was manifestly passed merely to remove the bar to such audit. The landowners had had their opportunity to work out their taxes under the Act of 1837, and had lost it long before any necessity for the Act of 1840 had become manifest.

III. It is objected that the notice to the landowners of the assessment of the tax, and that they might pay the same in labor, as provided by the statute, was published in April, 1838, whereas it should have been published partly in March and partly in April. We are quite at a loss to comprehend this objection. The defendant's counsel in their brief say the law required this notice to be published in March *or* April; that no change in this respect was made between 1824 and 1839. This publication was in 1838. Counsel are correct as to the law; and they would have been correct if they had added to their brief that this notice was published in strict conformity with the law.

IV. It is said that the rate bill issued to the collector by the committee set out the lot sold in the columns designating the original proprietor, the number, range, and number of acres as follows:

| "Original Proprietor. | Lot. | Range. | Acres | Amt. of Tax. |
|---|---|---|---|---|
| Robert Pike, southwest half, . . | 5 | 4 | 50 | 2," |

whereas they argue Samuel Parker was the original proprietor of said lot.

The referee refers in the report to the proprietor's records, but only meagre abstracts have been furnished us. However it appears therefrom that at a meeting held some time, the date not appearing, the proprietors of Granby chose a committee to draw the lots according to the statute, and that lot 5, 4th range, section 10, was drawn to Samuel Parker. The record further shows

that at a meeting held October 27, 1795, the proprietors "voted that, whereas the proprietors at their meeting holden heretofore have given as encouragement to the twelve settlers who should first settle in said town, a tract of public land not exceeding 150 acres to each, and whereas the following persons have made improvement according to said vote, and are considered as settlers, and to hold and enjoy to themselves and heirs and assigns forever in fee the lands hereafter voted to them respectively, viz.: To Robert Pike the half of lot 5 in the 4th range and the half of lot 5 in the 5th range to him, his heirs and assigns forever."

The Act of March 9, 1787, provided for a divison of land among proprietors by lot, and in the same section provided that "nothing herein contained shall prevent the proprietors from voting to any settler the lot he lives on in lieu of his draft."

It is quite evident that the vote recited was taken under the statute, and that Robert Pike was, by the action of the proprietors, the "original proprietor" of half of lot 5, range 4. He was a "settler," and had "made improvements" as "encouraged" by a former vote of the proprietors.

Where his half of lot 5 was is shown by the report. The plan shows that the "Pike lot," called the "settling" or "settler's" lot, was the southerly half of lot 5. Lot 5 was apparently cut up in accordance with the well known usage of the time by running the division lines at right angles to the ranged lines. The referee says that Pike went on to this lot at an early day, cleared up 15 to 25 acres, and had a house thereon. Pike sold in 1803, to Elliott, part of his settling lot by warranty deed, describing his grant as "the westerly half of settling lot No. 5 in the 4th range, containing fifty acres, together with the buildings and all the appurtenances thereunto belonging."

The "half of lot 5," voted to Pike, is clearly the southerly half, as indicated on the plan, and he was the original proprietor thereof and not Parker. But it is said that it is called

the " southwest half" in the rate bill. A glance at the plan will show, as the referee says, that the range lines were run at an angle of 45 degrees to the meridian line. It could well be called the southwest half.

But no law in force required the committee to set the name of the original proprietor in the rate bill, or to supply any rate bill at all. It obviously was necessary, or some document equivalent to it, to enable the collector to know and describe the lands he was to sell. But the purpose of it is to describe the lands, and in his notice of sale, as well as in the rate bill, the name of the proprietor is merely descriptive of the land. The name of a later owner might just as well be used.

We think there is no support for the objection.

V. The act appointed Buck, Appleton and Bell, committee. All signed the notice to landowners, but Appleton and Bell only signed the subsequent proceedings. It is said all should have signed or at least have acted.

There is a class of cases holding that where there is a joint power given to three all must act and all concur, and another class holding that all must act, but a majority may decide. The cases are reviewed in *Bank* v. *Mt. Tabor*, 52 Vt. 87. But when these proceedings were had, our statute, Rev. Stat. chap. 4. sec. 2, provided that " all words purporting to give a joint authority to three or more public officers or other persons shall be construed as *giving such authority* to a majority of such officers or other persons," etc. This statute is different from the one now in force, and clearly gives to the majority full power to act in the premises. Buck did act at the outset of the proceedings, and we cannot presume that he did not continue to act throughout from the fact that he omitted to sign certain papers made by the committee. If he acted, but dissented from the conclusions reached by his associates, their conclusion is neverless sufficient.

Bell signed by mark. This signature is not required to be verified. The proof of the proceedings is made by copies

from the public records, and the signatures are presumed to be copies of genuine originals.

VI. The collector adjourned his sale from time to time. The day fixed for the sale was February 25, 1841, and on that day the Pike lot was sold. If a subsequent adjournment was made it would not affect the validity of this sale. But it did not affect any sales. The collector is bound to conduct the sale for the best interests of all concerned. If he deemed it necessary to adjourn, he had the right to do so. No presumption is to be made against his doings.

On the whole, no reason has been shown us why the Fairchild tax sale was in any way irregular, and we think it conveyed the title of the lot in question to the plaintiff's grantor; and if so, it is conceded that the plaintiff holds the legal paper title to said lot.

But it is insisted that the plaintiff is estopped from asserting his title against the defendant, because he knew as early as 1865 that the defendant claimed the lot, paid taxes upon it, and in a lawsuit in 1870, or earlier, advised with and assisted the defendant in his attempt to establish a title to the lot. This all happened before the plaintiff got his title in 1872. He has not, as an owner, stood by and encouraged the defendant to make expenditures in the effort to make title to land in which the plaintiff had an interest, nor is it shown that the defendant, in what he has done to make title, has relied upon anything done or omitted by the plaintiff. The defendant to avail himself of an estoppel by conduct must show affirmatively that he has acted in reliance upon the fact being otherwise than it is claimed to be, *Earl* v. *Stevens*, 57 Vt. 474.

Lastly, the defendant claims the lot by adverse possession.

The plaintiff concedes that the defendant has got title by possession to the westerly half of the settling lot, but denies the claim to the easterly half whereon the cutting took place.

The westerly half has been inclosed by a fence and used in connection with the defendant's adjoining lands for a great

many years, but such use has no relation to the possession re-
lied upon to establish title to land east of said fence.

It is elementary that a possession that will work an ouster
of the owner must be open, notorious, hostile and continuous.
If stealthy, hidden, permissive or intermittent it will not avail.
The tenant must unfurl his flag on his land, and keep it flying,
so that the owner may see, if he will, that an enemy has in-
vaded his dominions and planted the standard of conquest.

The defendant confessedly had no color of title to the east-
erly half unless the Houston survey can be called such. This
was made in 1870, eleven years before the plaintiff gave notice
to the defendant to quit. No possession therefore for fifteen
years under color of title is shown. All possession prior to
the Houston survey was strictly *possessio pedis*. The Houston
survey is in these words and figures :

  " *Survey bill of division line between S. F. Austin and*
                        *A. R. Boyce.*

  " Survey made January 24, 1870, for Stephen F. Austin,
commencing on range line between range 4 and 5, 100 rods
from the corner of lot 4, range 5, on sd. range line near a
fence. Run south 45 1-2° east to range line between range 3 and
4 to stake, thence north 49° east 50 rods to a small spruce tree
one rod beyond an old corner or that J. Chandler run a line
from in March, 1867, then spotted a line about one rod from
the line run by sd. Chandler on the N. E. side in a N. westerly
direction to a stake for a division line of s lot 5 in range 4.

                                    I. R. HOUSTON."

This document does not show color of title to the land in
question so as to extend a possession constructively to the
whole tract. Indeed it would be pretty difficult to locate any
land within the description. *Atkinson* v. *Patterson*, 46 Vt.
750.

The possession of the defendant has been fragmentary and
occasional. In 1864 or 1865 he cut one or two trees for
shingles east of the fence and about the centre of the lot. He
also cut and made long shingles on this part of the lot several

times about 1872.   About 1871 he cut the timber on a strip three or four rods wide next to the Boyce piece on the north side.   He has occasionally repaired the old slash fence dividing the easterly and westerly halves of the lot, and cut trees for this purpose on either side the fence, as happened to be most convenient.   He has paid taxes on the land since 1862.

Nothing else is shown as to his acts from 1860 to 1881, when the plaintiff interfered with him.

It is fundamental that the claim of an adverse possession must be made out by clear and satisfactory proof.   Every presumption is to be made in favor of a possession in subordination to the legal title.   The burden is on him who sets up an ouster.   Sedgwick & Wait, Title to Land, ss. 728, 730, *et seq.;* 2 Waterman on Trespass, s. 633.

It follows that acts of occupancy that as well indicate a trespass by a wrong doer as a possession by an owner are *prima facie* trespasses.

A roving possession from one part of a tract to another is insufficient.   *Potts* v. *Gilbert,* 3 Wash. C. C. 478.   The location and natural features of the land will obviously determine in a large degree the characteristics of the possession of which it is susceptible.   *Bowen* v. *Guild,* 130 Mass. 123.   If it be near or remote from a mill or farm, and at customary intervals is invaded for wood or lumber, this stamps the impress of ownership upon the possession.   *Miller* v. *L. I. R. R. Co.* 71 N. Y. 383.   On the other hand, if it be "marauders' ground" invaded whenever and wherever it is convenient to answer a temporary call for shingles or lumber, the entry is mere depredation.   *Beaupland* v. *McKeen,* 28 Penn. St. 124, 134.   Between these two extremes there is a debatable ground where it is oftentimes difficult to distinguish the features of the occupancy.

Again, when the occupancy is under color of title as well as claim of right, less positive and pronounced acts of possession are required than in its absence.

But in all cases the burden is upon the party claiming an

adverse possession to show a state of facts that establish the adverse title. Here the facts detailed in the report come far short of this requirement.

Without color of title the defendant cuts a tree or two in 1864 or 1865, the circumstance so insignificant as to leave the cutting doubtful in time and extent, then neglects the land thereafter till 1871, when he cuts the strip on the north line next to Boyce, how long the strip or why cut over not appearing; then makes shingles in 1872, how many and the character of the occupancy are not shown; and, finally, the haphazard cutting of trees to repair the fence on either side as was most convenient, are the acts disclosed as constituting an occupancy openly and continously hostile to the true owner.

The judgment is reversed, and judgment for the plaintiff to recover the damages found by the referee.