EDWIN W. ROYCE v. NORRIS L. CARPENTER AND HENRY R. TAYLOR.

May Term, 1904.

Present: ROWELL, C. J., MUNSON, WATSON, STAFFORD, and HASEL-TON, JJ.

Opinion filed May 10, 1907.

*Bond for Deed—Title of Purchaser—Assignment—Title of As-signee—Estoppel—Knowledge of Facts—Reliance by Ad-verse Party—Laches—Nuisance—Equitable Relief—Water Power—Injury from Dam—Injunction.*

A bond for a deed is a contract for the sale of real estate, and is assignable.

Under such a contract, the purchaser is the equitable owner of the land, and an assignee takes the same estate.

A court of equity will regard the substance, rather than the mere form, of an assignment, and will give it such effect as the parties intended.

The equitable owner of land gave a bond for a deed to a purchaser who paid part of the price, entered into possession, and later trans-ferred the premises, by mere indorsement on the bond, to a third person who, after retaining possession for about seven months, surrendered it to said purchaser and returned to him the bond, with an indorsement reciting that the third person transferred the premises to said purchaser. Thereafter said purchaser trans-

ferred the premises, by mere indorsement on the bond, to the orator, who took and retained possession thereof. *Held* that these transactions amounted to a conveyance of the equitable estate to the orator.

On appeal, exceptions to a master's report that are not founded on objections made before the master will not be considered.

Where, on appeal in a suit in equity tried before a master, a certain document presented to the master is referred to in his report and made a part thereof, but neither the document nor a copy of it is furnished this Court, an exception to the master's report because of his ruling in respect thereof will not be considered.

In order to raise the question whether a master erred in receiving or rejecting evidence, his report must furnish the foundation for the question.

The question whether the master in receiving and considering certain questions and answers in a deposition, which were specifically objected to by defendants at the time of the taking of the deposition, will not be considered on appeal, where, although the master's report refers to the deposition for another purpose, it says nothing regarding any objection thereto, and the exception to the report refers to the deposition, but it is not furnished the Court.

He who relies upon an estoppel *in pais* must show an express or implied representation and reliance and action thereon to his injury, in ignorance of the truth.

An upper mill owner who, without making objection, saw a lower mill owner expend his money in building a dam and mill, and himself furnished timber for the dam, is not estopped by acquiescence or laches from asserting his rights against the lower mill owner because of his setting back water and thereby injuring the water power of the upper mill, where it appears that when he furnished the timber he did not know what would be the effect of the construction of the dam, and the lower mill owner did not rely on the conduct of the upper mill owner.

In order that acquiescence in wrongful acts shall operate to preclude one from obtaining relief therefor, the acquiescence must be not only with knowledge of the wrongful acts, but also of their injurious consequences, and this must last for such an unreasonable length of time as to make it inequitable to enforce equitable remedies against a wrongdoer.

In order that laches shall operate to preclude one from obtaining equitable relief against the wrongful act of another, it must appear that the latter changed his situation after the former had knowledge that he would be damaged by such wrongful act.

A court of equity will redress an injury resulting from a private nuisance only where the injury cannot be adequately compensated by damages at law, or where from the continuance of the nuisance a constantly recurring grievance results which can be prevented only by an injunction.

In a suit in equity for relief from injuries sustained because of the maintenance of a dam, causing backwater to interfere with the orator's mill wheel, it appeared that the water was frequently set back upon the orator's mill wheel so as to interfere with its operation, and that the damage would continue to a greater or less extent, dependent upon the character of the orator's mill and the amount of business done there, as long as the dam was maintained at its present height. There was no evidence of the comparative values of the properties affected, nor of the balance of convenience in granting or refusing equitable relief. Held, that equity would perpetually enjoin the maintenance of defendant's dam so as to interfere with the orator's water power.

APPEAL IN CHANCERY. Heard on the pleadings, master's report and exceptions thereto, at the June Term, 1903, Windsor County, Tyler, Chancellor. Exceptions overruled, and decree for the orator establishing the line between the orator and the land of Agatha Moore upon which defendant's mill stands, at the place reported by the special master, enjoining defendants from flooding the orator's land, and for the orator to recover twenty-five dollars, damages to the time of the bringing of the bill, and his costs. The defendants appealed. The foregoing is the plan referred to in the opinion:

W. W. Stickney, John G. Sargent, and Homer L. Skeels for the orator.

Gilbert A. Davis and Waterman & Martin for the defendants.

The master erred in receiving the testimony of Frederick A. Butler as to conversations and a contract between him and W. H. Sawyer. That was a contract in issue and on trial. *Davis, Admr.* v. *Bank,* 48 Vt. 538; *Pember* v. *Congdon,* 55 Vt. 58; *Hall* v. *Hamblet,* 51 Vt. 589; *Merrill* v. *Penney,* 43 Vt. 605; *Randall, Admr.* v. *Randall,* 64 Vt. 419; *Farmers' Mut. Fire Ins. Co.* v. *Wells,* 53 Vt. 14; *Fitzsimmons* v. *Southwick,* 38 Vt. 509; *McElroy* v. *McLevy,* 71 Vt. 398.

The orators are precluded from equitable relief by laches and acquiescence. *Greene* v. *Smith,* 57 Vt. 268; Gould, Waters, §530; *Pratt* v. *Lamson,* 2 Allen 275; *Prentiss* v. *Wood,* 118 Mass. 589; Angell, Watercourses, §328; *Wendell* v. *VanRenselear,* 1 John. Chan. 353; *Ottaquechee Woolen Co.* v. *Newton,* 57 Vt. 468.

WATSON, J. The allegations of the bill show that for some years the orator has been and now is the owner of a certain sawmill on the northerly bank of Black River in the town of Plymouth, together with the water privilege and the land connected therewith, the same being occupied and used by him for lumbering purposes; which premises are bounded on the south by land formerly owned and occupied by William Earle, and on the east by land formerly owned by Agatha M. Moore. It appears from the report that in earlier days the land about the orator's mill and owned in connection with it, was called the "Briggs millyard." The allegations further are that the orator holds a bond for a deed and is in possession of the land above referred to as formerly owned and occupied by William Earle. This land is on the south side of the river against and extending below the orator's mill, and is bounded on the north by the river. It is called the Ormsby or Earle lot, but hereinafter reference will be made thereto as the Earle lot.

The defendants, having purchased of Agatha M. Moore the land bordering the orator's mill property on the east, and known as the Shaw lot, in 1900 erected a dam across the river a short distance below the orator's dam and mill, and thereby flowed some of the Earle lot to his damage, and also set back the water in the river so as to flow his land and injure his water-power and sawmill. The orator prays that the defendants may be enjoined from thus overflowing his land and injuring his water-power and sawmill, for an account to be taken of the damages, and for general relief.

September 28, 1899, John A. Woods owned the equitable title to the Earle lot, and it became his by deed July 31, 1900. On the former date he gave a bond for a deed of the same to Joseph M. Dyer who paid forty dollars towards the purchase price and entered into possession of the property. November 6, 1899, Dyer and his wife transferred the same by indorsement on the bond to Orlando L. Coolidge, the latter taking possession. He retained the possession until June 11, 1900, when he surrendered it to Dyer and gave him the bond, there being no transfer in writing, except that Coolidge placed thereon in writing, "I the said O. L. Coolidge transferred to the said J. M. Dyer, June 11, 1900." September 4, following, Dyer and wife transferred the same, by indorsement on the bond, to the orator who took possession of the place and has retained it ever since. The bond and transfer to the orator were recorded in the land records of the town. On the first day of the next month a payment fell due on the bond. This and all subsequent payments falling due thereon to the time of the hearing before the master, were made by the orator. The bond was a contract for the sale of land, and assignable. Under such a contract the purchaser is treated in equity as the equitable owner of the land, and an assignee takes the same equitable estate.

It is said that Dyer and wife, after their transfer to Coolidge, had no legal title to the contract and hence they could assign no interest therein to the orator. The assignment back to Dyer, though informal, was written by Coolidge on the bond. In connection therewith he gave the bond to Dyer and surrendered the possession of the property. By this transaction the parties intended manifestly that all the equitable rights in the property under the contract owned by Coolidge should be assigned to Dyer. A court of equity will regard the substance, rather than the mere form of the assignment, and give it such effect as the parties intended. Under the subsequent assignment from Dyer and wife the orator has the same rights.

Shortly before Dyer transferred the bond to Coolidge, the defendant Carpenter applied to them for the privilege of flowing the water of the river upon the Earle place, if the defendants should erect their dam as it is now located. Wood, Dyer, and Carpenter met near the place of the dam and verbally agreed that the defendants might build their dam of the height later

set forth in the deed from Wood to them, dated June 6, 1900, on Carpenter's paying twenty-five dollars to be applied on the bond to Dyer. At some time the twenty-five dollars was paid by Carpenter to Wood, but it was never indorsed on the bond. When the bond was assigned to Coolidge he had notice of the agreement with Carpenter and consented to it. The record does not show that the orator, at the time of his purchase of the bond, had actual notice of this agreement or of such payment, but facts are found touching the question of constructive notice. The damages to the Earle land are reported separately, and the question whether on the facts found the orator was entitled to recover the same was submitted to the court. The court below disallowed these damages, thereby impliedly holding the orator chargeable with constructive notice. Since in this no claim of error is made we pass to the other branch of the case.

The determination of the true location of the division line between the land of the orator and the land of the defendants is essential to the decision of the case. The orator claimed before the master that it was the southerly portion of line iv to 7 on the plan marked "Batchelder's Plan," and if not this line, then the line 3 to 4 to 8 on the same plan, or a line near them. This line as first above given strikes the south bank of Black River about fourteen rods southerly of the foundation of the old sawmill which stood pretty near where the orator's present mill stands. The defendants claimed the true line starts on the south bank of the river four rods or nearly that distance below the orator's mill. The master finds that the original line between the "Briggs millyard" and the Shaw lot was the southerly end of the line iv to 7 laid down on the plan and that in the early days the "Briggs millyard" came down the river to that line. The defendants did not seriously question this, but contended that about 1831 there was a change made in the location of the line so that it commenced on the south bank of the river, four rods or about that distance down stream from the foundation of the Briggs sawmill as it then existed. But from all the evidence the master was unable to find that the line was ever changed from where it originally ran, and he finds the line, commencing at point 7 on the plan and running toward point iv as far as the road or wall to be the true line between the parties.

It is said, however, that the master reached this conclusion by an erroneous construction of Ex. 27, a deed from Franklin Prior to Walter Fletcher, dated January 25, 1831. The master construed this deed as conveying one undivided half of the Shaw lot, whereas the defendants say it should have been construed as conveying the whole lot. The defendants objected to the construction given because they said that when properly construed the title to the Shaw lot and to the Briggs mill lot merged in Fletcher and that he made a change in the division line between them. The master says such merger could not have been, for the title to the Shaw property was in Prior and Fletcher and they conveyed it September 20, 1831, by their warranty deed to I. P. Brown, bounding it on the up-river side by the Briggs sawmill yard.

If the master's construction is right there could be no such merger of title as defendants claim. Nor could there be if his construction is wrong: June 29, 1825, Asa Briggs conveyed the mill-lot to Asa Briggs, Jr. The findings show that the land thus conveyed included the "Briggs millyard," extending down the river to the "original line" between it and the Shaw lot. No further change of title appears until October 23, 1828, when Asa Briggs and Asa Briggs Jr. conveyed the property to Walter Fletcher, the point of beginning named in the deed being "about four rods south of the sawmill, thence northerly across the road to I. P. Brown's land." With the point of beginning and the easterly line as thus given, Fletcher took by that conveyance no title to the land between the two lines here claimed by the respective parties,—that remained in Asa Briggs Jr. or in him and his father. January 25, 1831, Fletcher conveyed the mill property by the same description to Franklin Prior, and Prior on the same day executed to Fletcher exhibit 27, before noticed. There was still the land between the two lines owned by neither Prior nor Fletcher, and as an inevitable sequence to defendants' position there could have been no merger of title. Nor could there be a resulting merger from the orator's predication that the easterly line of the millyard has always remained the same. For then under the conveyances of January 25, 1831, Prior took the mill lot and Fletcher the Shaw lot with the original dividing line between them. In either view therefore the defendants' objection to the master's construction of deed exhibit 27, regard-

ing its force as evidence bearing on the line in question,—and it was in this respect that the objection was made,—is without force. No other objection is available under the exception. *Sargent* v. *Burton,* 74 Vt. 24, 52 Atl. 72; *Bourne* v. *Bourne,* 69 Vt. 251, 37 Atl. 1049; *Allen's Admr.* v. *Allen's Admrs.,* 79 Vt. 173, 64 Atl. 1110.

Defendants argue that other deeds were also misconstrued by the master, but be this as it may, no exception brings the matter before us.

The master further finds that the line on the plan drawn from 3 to 8 represents the division line between the orator's land and that of the defendants, by prescription. But in making this finding testimony was used given by one Frederick A. Butler, the orator's immediate grantor, showing a contract between him and Winslow H. Sawyer, a former owner of the Shaw lot and now dead, whereby for a consideration paid by the former to the latter, the line was established as above indicated, with subsequent use and occupation to the line thus established by Butler under a claim of right for more than fifteen years. Defendants objected to Butler's testifying to any contract with Sawyer, the latter being dead, and they stand on an exception to the report based thereon. It is unnecessary to consider the question thus raised, since the original line as found by the master stands as the true line between the parties. It is for the same reason unnecessary to consider the questions argued relating to the admissibility of any of the testimony of this witness bearing on the existence of the prescriptive line, including his acts and declarations concerning it.

It is further contended that all of the testimony given by Butler should have been excluded from consideration, for the reason that he was not present after the close of the hearing before the master, to be further cross-examined. The witness was examined and cross-examined before the master fully. When the hearing there was closed each party reserved the right to take the depositions of one or two persons, and the defendants' solicitor said he wished to cross-examine Butler further and reserved that right. No further cross-examination was had. Whose fault it was the master had no knowledge. The master states that a copy of a subpoena for taking the depositions of Abram Merrill and Butler was sent him by defendants' solicitor,

claiming it showed the orator in fault for defendants' not having Butler's deposition to use. He further states that no service of the subpoena on Butler was shown by the copy, and he could not find from it that it was the fault of the orator that the deposition was not taken. The exception to the report in this regard is because the master was misled as to the character of the document relating to the taking of the deposition—that it was not a subpoena, but a citation served on defendants to be present at the taking of Butler's and Merrill's depositions by the orator, and therefore it was incumbent on the orator to show why Butler's deposition was not taken accordingly. The paper thus in question was made a part of the master's report, but neither it nor a copy has been furnished the Court. Hence we cannot say that the master was in error.

Exception was saved to the report because the master received and considered in Merrill's deposition questions and answers specifically objected to by defendants at the time of the taking. Although the report makes reference to the deposition for another purpose, it says nothing regarding any objection thereto, nor has the deposition been furnished. The exception refers to the deposition. Several other exceptions were taken to the report because the master received or rejected certain pieces of testimony. The report does not show that any objections were made before the master on which these exceptions are based, nor does it refer to the transcript of testimony for that purpose. Reference is made to the transcript in defendants'. exceptions, but this does not bring it before the Court. *Sowle's Admr.* v. *Sartwell,* 76 Vt. 70, 56 Atl. 282. These exceptions, therefore, including those relating to the deposition, are not considered.

The defendants began to erect their dam in May, 1900. At that time the orator was in the South, returning the last days of June. He then knew defendants were erecting their dam and sawed or caused to be sawn in his mill some timber to be used in the dam. It is urged that the orator's conduct in this respect together with his standing by and seeing defendants expend their money in building the dam and mill, without making objection, constitutes such acquiescence and laches on his part as will estop him in equity from asserting his rights here claimed. The master states that there was no evidence that the material was fur-

nished with such knowledge of what the effect of the erection of the dam and mill would be upon the orator's mill as estops the latter from relief in the premises.   Nor was any finding made that the defendants relied upon the conduct of the orator in this behalf, or were thereby influenced in their actions.   There can be no estoppel unless the party alleging it relied upon the representation,—whether in words, acts, or silence,—of the party to be estopped, was induced to act by it, and thus relying and induced, did take some action.   *Wooley* v. *Edson*, 35 Vt. 214; *Wells* v. *Austin*, 59 Vt. 157, 10 Atl. 405; 2 Pom. Eq. Jur. sec. 812.

Nor was there such acquiescence in the wrongful acts of the defendants by the orator as will operate, on principles of and in analogy to estoppel, to preclude him from obtaining equitable relief, leaving him to his remedy at law.   To have this effect the acquiescence must be not only with knowledge of the wrongful acts themselves, but also of their injurious consequences, and it must last for such an unreasonable length of time as to make it inequitable to the wrong-doer to enforce the remedies of equity against him after being suffered to go on unmolested and with apparent acquiescence in his conduct.   Here the orator's knowledge of the injurious consequences is negatived by the findings, hence there is no *quasi* estoppel.   2 Pom. Eq. Jur. sec. 817; *City of Logansport* v. *Uhl et al.*, 99 Ind. 531; *Bausman* v. *Kelley*, 38 Minn. 197, 8 Am. St. Rep. 661.   It is the use of the dam, not its erection, that is an interference with the orator's rights (*Dutton* v. *Stoughton*, 79 Vt. 361, 65 Atl. 91), hence without knowledge of the injuries consequent on use he would have no knowledge that a wrong had been committed.   That one cannot acquiesce in a wrong while ignorant that it has been committed is too self-evident to require further discussion.

Nor is the case presented one where the doctrine of laches should be applied.   No facts are found showing any change of situation by the defendants after the orator had knowledge that he would suffer damages arising from backwater and before the commencement of these proceedings, ten and one-half months later.   In these circumstances it cannot be said that the delay was so prejudicial to the defendants as to render it inequitable for the orator now to assert his rights.   *Halstead* v. *Grinman*, 152 U. S. 412, 38 L. ed. 495.

Finally, defendants contend that all damages which the orator has or will suffer from backwater can be fully and adequately compensated by a pecuniary sum, and that to grant a perpetual injunction is inequitable. It is found that up to the time of bringing this suit the orator had suffered by the erection and maintenance of defendants'. dam twenty-five dollars; that when the water is high, so as to flow over the dam six inches or more to one or two feet, as it frequently does, the water sets back on orator's wheel so as seriously to obstruct it and render it impossible to obtain sufficient power to run his sawmill to any advantage; and that the damage will continue to a greater or less extent dependent on the character of the orator's mill and amount of business he can command, as long as defendants maintain their dam at its present height. Nothing appears regarding the comparative values of the properties affected, nor as to the balance of convenience or inconvenience in granting or withholding such injunction.

Courts of equity do not always as a matter of course afford relief by way of injunction in cases of this nature where a right of action exists for a nuisance. In the case of *Ottaquechee Woolen Co.* v. *Newton*, 57 Vt. 451, the orator sought such relief against the defendants' erection of a dam which would set the water back on its wheel, but an injunction was refused. The defendants had been to great expense in the purchase of property, and in making preparations to build up an extensive manufacturing business, prospectively of great public benefit. It was there said that in determining whether an injunction should be granted or denied, the court should take a broad and comprehensive view of the situation and ascertain if it will be equitable to grant it. The refusal of the writ was placed on two grounds, one of which was that the anticipated trouble from backwater could nearly, if not quite, be obviated by the substitution of a different wheel from the one then in use by the orator, and that the expense of such substitution would be small as compared to the loss of defendants by being deprived of the right to utilize their water power. In' *Dutton* v. *Stoughton*, to which reference has been made, an injunction was granted, but no question was made respecting the nature of the relief.

Equitable jurisdiction regarding private nuisances is based upon the ground of restraining irreparable mischief, or of pre-

venting vexatious litigation or a multiplicity of suits. But to justify the interposition of a court of equity to redress the injury or remove the annoyance "there must be such an injury, as from its nature is not susceptible of being adequately compensated by damages at law, or such as, from its continuance or permanent mischief, must occasion a constantly recurring grievance, which cannot be otherwise prevented but by an injunction." 2 Story, Eq. Jur. sec. 925; Kerr on Injunctions, 225; Gould on Waters, sec. 528; *Imperial Gas Co.* v. *Broadbent*, 7 H. L. 600; *Holsman* v. *The Boiling Spring Bleaching Co.*, 14 N. J. Eq. 335; *Carlisle* v. *Cooper*, 21 N. J. Eq. 576; *Turner* v. *Hart*, 71 Mich. 128, 15 Am. St. Rep. 243.

Applying these principles to the circumstances presented by the case before us, clearly an injunction should issue. The findings show an injury not only from the essential nature of which, but also from its continuous character, the legal remedy is inadequate,—one which cannot be prevented otherwise than by an injunction.

*Decree affirmed and cause remanded with mandate.*